**VICTOR BROADCASTING, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**Radio Station WABZ, Inc., Intervenor.**

**No. 82–1964.**

United States Court of Appeals, District of Columbia Circuit.

Argued 2 May 1983.

Decided 22 Nov. 1983.

· George R. Borsari, Jr., Washington, D.C., with whom Leonard S. Joyce, Washington, D.C., was on the brief, for appellant.

Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C., with whom Marjorie S. Reed, Acting Gen. Counsel, David Silberman and S. Lee Martin, Counsel, F.C.C., Washington, D.C., were on the brief for appellee.

Donald E. Ward and Eric S. Kravetz, Washington, D.C., were on the brief, for intervenor.

Before WILKEY and MIKVA, Circuit Judges, and McNICHOLS,* Senior District Judge, United States District Court for the District of Idaho.

Opinion for the court filed by Circuit Judge MIKVA.

Dissenting opinion filed by Circuit Judge WILKEY.

MIKVA, Circuit Judge:

This case involves a license renewal hearing for an FM radio station. The hearing presented a contest between the current holder of the license, Radio Station WABZ (WABZ) and the challenger Victor Broadcasting, Inc. (Victor). The Federal Communications Commission (FCC or Commission) renewed the license of the incumbent WABZ. Victor brought this appeal to challenge the FCC's comparative analysis of the strengths and weaknesses of Victor and WABZ. Included within the general challenge is the specific issue of whether the Commission adequately considered WABZ's duplication of the programming of its sister AM station, WWWX. We conclude that the FCC was "painstaking and explicit in

its balancing" and that its findings were reasonably articulated and based on substantial evidence. *See Central Florida Enterprises, Inc. v. FCC (Central Florida II),* 683 F.2d 503 (D.C.Cir.1982) (Wilkey, J.), *cert. denied,* —— U.S. ——, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983); *Miner v. F.C.C.,* 663 F.2d 152 (D.C.Cir.1980). We thus affirm the FCC's decision.

## I. BACKGROUND

WABZ has owned and operated an FM station in Albemarle, North Carolina since 1958. WABZ also owns a daytime-only AM station, WWWX, in the same community. During the day, both stations operate and WABZ–FM duplicates WWWX–AM programming in its entirety. *Radio Station WABZ, Inc.,* 90 F.C.C.2d 818, 836 (1982) (hereinafter referred to as *Hearing*). WABZ–FM's only independent programming occurs in the evening or the early morning. The FM station, on an average day, presents 31 minutes of independent, non-duplicative, non-entertainment programming. *Id.* On some days, the FM station presents almost an hour of non-duplicative public affairs or non-entertainment programming. WABZ's non-duplicated programming primarily "consists of local and syndicated religious programs, an occasional special musical or religious event, and live coverage of high school football games." *Hearing,* 90 F.C.C.2d at 843 n. 139. None of this programming is broadcast during the "graveyard shift." Rather, WABZ airs the programs at "times convenient to its listeners." *Id.* at 840. Numerous affidavits filed with the FCC attest to the high standard of WABZ's service to the community.

In July 1975, WABZ filed a license renewal application for its FM station. Shortly thereafter, Victor filed a competing application. Because the two applications were mutually exclusive, the FCC designated them for a comparative hearing. *See* Designation Order, 43 Fed.Reg. 8,181, *corrected,* 45 Fed.Reg. 10,732 (1978). The ad-

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

ministrative law judge who presided at the hearing recommended that the Commission grant the renewal application of WABZ. *Hearing,* 90 F.C.C.2d at 810.

In July 1982, the Commission adopted the administrative law judge's findings and granted WABZ's license renewal application. *Id.* at 846. The FCC relied on a comparative analysis—that is, it weighed the benefits of granting the license to Victor as against the benefits of renewing WABZ's license. As a necessary preliminary step to this balancing, the Commission examined several factors and determined which applicant was in a preferred position with respect to those factors. The FCC first assessed a moderate comparative demerit against Victor for its many reporting violations in its other station operations. Although the violations were inadvertent, the Commission concluded that "Victor's numerous violations reflect an inattention to [FCC] reporting requirements which we do not want to encourage." 90 F.C.C.2d at 827. The individual who would serve as the station's general manager was responsible for the reporting violations.

The Commission then considered the issues of diversification and "best practicable service." Because Victor would introduce a new station to the community, the FCC concluded that Victor deserved a clear preference for diversification. However, the FCC also concluded that this preference was somewhat diluted by Victor's interests in radio stations in other communities in South Carolina and North Carolina. *Id.* at 831. Within the category "best practicable service," the Commission considered integration of ownership and management, efficient use of frequency, and WABZ's past broadcast record. As regards integration, the Commission considered whether owners would be involved in the radio station's daily management. Because an owner would serve as its general manager, Victor received a preference for integration. That owner, however, was responsible for the reporting violations. The FCC thus concluded that the owner's "demonstrated indifference to our reporting requirements diminishes the preference which Victor would otherwise receive on this issue." *Id.* at 833.

The category labeled "Efficient Use of Frequency" included two issues. First, the Commission compared the size of the audience which each applicant would reach. Because Victor would serve 30% more people, Victor received a "slight preference." The characterization of the preference as "slight" reflects the fact that the extra territory that Victor would reach already received three or four radio stations. Second, the Commission considered program duplication and assessed a moderate comparative demerit against WABZ. *Id.* at 836. WABZ made no showing to justify its program duplication. The Commission, however, noted that although program duplication leads to a demerit for the incumbent, "it does not . . . merit a preference to the applicant which proposes no duplication." *Id.* at 836 n. 93.

Finally, the Commission considered WABZ's past broadcast record. The Commission concluded that WABZ's performance was superior and deserved a particularly strong comparative preference. *Id.* at 839. In reaching this result, the FCC noted that the station had devoted more than 20% of its broadcast time to non-entertainment programming. Additionally, numerous affidavits attested to WABZ–FM's service to the local community. *Id.* at 841. The Commission concluded that "the station's impressive reputation in the community, together with its emphasis on local programming, demonstrates a superb commitment to serving the community, which is far above a level of mediocre service which might minimally warrant renewal." *Id.* at 842.

The FCC then integrated these factors into a comparison between WABZ and Victor. After concluding that structural factors such as diversification and integration have less significance than does a record of superior performance, the Commission found that "Victor's advantages under diversification and best practicable service are insufficient to overcome its demerit for

the reporting violations and WABZ's distinct preference for past broadcast record as diminished by its moderate demerit for proposed program duplication." *Id.* at 846. Because the Commission concluded that the public interest would best be served by WABZ's continuing service, it granted the license renewal and denied Victor's application for a new facility. Thereafter, Victor brought this appeal.

## II. ANALYSIS

### A. *The Court's Role*

■ It is well-established that to determine whether to renew a radio station license the FCC must engage in a "comparative weighing of pro-renewal considerations against anti-renewal considerations." *See, e.g., Central Florida II,* 683 F.2d at 507. The role of the court in reviewing an FCC decision reached after a comparative hearing is narrow. *Central Florida Enterprises, Inc. v. FCC (Central Florida I),* 598 F.2d 37 (D.C.Cir.1978) (per Wilkey, J.), *cert. dismissed,* 441 U.S. 957, 99 S.Ct. 2189, 60 L.Ed.2d 1062 (1979). In *Miner v. FCC,* 663 F.2d 152 (D.C.Cir.1980), this court explained its function when reviewing an FCC comparative hearing:

> It is necessary only that we satisfy ourselves that the agency acted within the bounds of its statutory and constitutional authority, that it has followed its own procedural rules and regulations, that its findings of fact are reasonably articulated and based on substantial evidence in the record as a whole, that its conclusions do not deviate greatly from past pronouncements without sufficient explanation, and that in general it has engaged in reasoned decision-making. . . . [I]t is not our judicial job to direct the Commission on how to run the comparative hearing process, beyond assuring that the administrative process respects the rights of the public and of competitors assured under the Communications Act . . . and that it produces rational decisions based on factors generally known in advance. [footnotes omitted].

*Id.* at 155 (quoting *Fidelity Television, Inc. v. FCC,* 515 F.2d 684, 699–700 (D.C.Cir.), *cert. denied,* 423 U.S. 926, 96 S.Ct. 271, 46 L.Ed.2d 254 (1975)). In *Central Florida I,* 598 F.2d at 49, this court succinctly summarized the proper standard of review: "[T]he agency must engage in reasoned decision-making, articulating with some clarity the reasons for its decisions and the significance of facts particularly relied on." We must proceed cautiously, however, to avoid substituting our judgment of how the public interest may be furthered for that of the agency.

### B. *The Commission's Actions*

In reviewing license applications, the FCC must consider, under the Federal Communications Act, "whether the public convenience, interest, or necessity will be served thereby." 47 U.S.C. § 307(a) (1976). In the instant case, Victor argues that the FCC did not adequately assess the public interest because it failed to compare properly the benefits of its application against the benefits of WABZ's continuing service. Victor's principal contention is that, because of WABZ's program duplication, the Commission should have discounted substantially WABZ's record of superior past performance.

#### 1. *WABZ's past performance and its duplication of programming*

■ This case reflects the tension between the "renewal expectancy" and the policy against "automatic renewal." The renewal expectancy is based on a concept that "the public itself will suffer if incumbent licensees cannot reasonably expect renewal when they have rendered superior service." *Citizens Communications Center v. FCC,* 447 F.2d 1201, 1213 n. 35 (D.C.Cir. 1971). For many years this court and the FCC have struggled over the weight to be accorded to a broadcaster's renewal expectancy. *See, e.g., Fidelity Television, Inc. v. FCC,* 515 F.2d 684 (D.C.Cir.), *cert. denied,* 423 U.S. 926, 96 S.Ct. 271, 46 L.Ed.2d 254 (1975). We have concluded that, as a corollary to the rule that the FCC must engage in reasoned decision-making, the Commis-

sion may not create an irrebuttable presumption in favor of the incumbent. In a comparative hearing, automatic license renewal clearly is improper. *See, e.g., Citizens Communications Center v. FCC,* 447 F.2d at 1213–14.

The Commission, however, may *consider* the incumbent's renewal expectancy as one factor in the balance. In *Central Florida II,* this court upheld an FCC policy which provided that "renewal expectancy is to be a factor weighed with all the other factors, and the better the past record, the greater the renewal expectancy 'weight.'" *Central Florida II,* 683 F.2d at 506. The "renewal expectancy," however, must be factored in for the benefit of the public and not for the benefit of the incumbent. *Id.* at 507. In the instant case, Victor would have us adopt a rule that, as a matter of law, duplication of programming prohibits a finding of superior performance and extinguishes renewal expectancies. It is established FCC policy that duplication of programming is a "wasteful and inefficient use of two frequencies." *Hearing, supra,* 90 F.C.C.2d at 835 (citing *AM–FM Program Duplication,* 46 F.C.C.2d 277 (1974)). We cannot agree with Victor's position, however, that duplication *per se* negates a renewal expectancy.

Before the Commission can evaluate the weight, if any, that should be given to the renewal expectancy, it must first consider the incumbent's record of previous service. The better the previous service, the more weight the renewal expectancy receives. In *Central Florida II,* this court upheld the FCC's treatment of the incumbent's past service. There the Commission reviewed the licensee's community reputation and the degree to which the programming was community-oriented. In the instant case, the Commission examined the same factors and concluded that WABZ's past performance record was superior. WABZ's performance record reflected an "impressive commitment to serve[ ] the needs of Albermarle (*sic*)." *Hearing, supra,* 90 F.C.C.2d at 840.

To evaluate WABZ's past performance, the FCC examined the station's entire record of service on the relevant frequency. The Commission did not separately analyze the benefits flowing from the duplicative programming and from the independent programming. Rather than address duplication in its initial analysis of past performance, the FCC chose to treat duplication elsewhere in its balancing. This approach was reasonable. In *Central Florida II,* we addressed a similar issue: whether the FCC had properly considered the incumbent's prior violations of FCC rules. In language applicable to the instant case, we rejected this issue of timing:

> We note that there is some confusion between the Commission's pleadings and the Commission's decision as to whether the main studio move violation was weighed against the renewal expectancy, or diminished the renewal expectancy to begin with.... An analysis of this hypertechnical issue would be relevant only were we to concede that it matters when the various factors are weighed, but this sort of timing should not, *must not,* be critical.... The merit or lack of merit in the incumbent's record ... and all the other factors are to be weighed, all at once, with an eye toward the public interest. Nothing is removed from the scales until the balance is struck....

*Central Florida II,* 683 F.2d at 506 n. 16 (emphasis added). As that case implied, so long as the final comparative evaluation is complete, we do not require that the Commission consider the factors in any predetermined order.

Moreover, even were we to require that the FCC consider the impact of duplication in its analysis of "past performance," we would not conclude that the Commission's approach in the instant case was unreasonable. Past performance must be evaluated with an "eye toward the public interest." *Central Florida II,* 683 F.2d at 507 n. 16. That is, the FCC must evaluate past performance in relation to the listening audience, in terms of benefit to the public. Although some of the programming originated at the sister station, the evidence

before the Commission indicates that the public perceived the benefit as flowing from *WABZ*'s broadcasts. After noting the numerous affidavits the administrative law judge received, the FCC concluded: "[WABZ's regular listeners] . . . uniformly attested to *WABZ–FM*'s high quality of service to the community, commending it for its locally originated programming and its cooperation with local service organizations." 90 F.C.C.2d at 842 (emphasis added). None of the affiants limited their praise to the independent programming. Because the public's perception of a radio station's performance is relevant to the Commission's determination of the public interest, the Commission reasonably based its analysis of WABZ's performance on the station's entire broadcast record.

■ Upon review of the FCC's order, we conclude that its finding of "superior performance" by WABZ is supported by substantial evidence and is otherwise reasonable. WABZ devoted more than 20% of its broadcast time to non-entertainment programming. This programming was broadcast at times convenient to the listening public. Additionally, both testimony before the administrative law judge and numerous affidavits praised WABZ's service to the community. Not a single complaint was introduced into evidence. Because WABZ had a superior record of past performance to the community, it usually would be entitled to a heavily-weighted renewal expectancy. *Central Florida II*, 683 F.2d at 506.

There is nothing inherent in program duplication that eviscerates renewal expectancies. The policies that underlie a renewal expectancy were most clearly stated in *Cowles Broadcasting, Inc.*, 86 F.C.C.2d 993, 1013 (1981), aff'd, *Central Florida II*, 683 F.2d at 507. The FCC here iterated the same policy concerns. Three "justifications" support a renewal expectancy:

(1) There is no guarantee that a challenger's paper proposals will, in fact, match the incumbent's proven performance. Thus, not only might replacing an incumbent be entirely gratuitous, but it might even deprive the community of an acceptable service and replace it with an inferior one. (2) Licensees should be encouraged through the likelihood of renewal to make investments to ensure quality service. Comparative renewal proceedings cannot function as a "competitive spur" to licensees if their dedication to the community is not rewarded. (3) Comparing incumbents and challengers as if they were both new applicants could lead to a haphazard restructuring of the broadcast industry especially considering the large number of group owners. We cannot readily conclude that such a restructuring could serve the public interest.

*Central Florida II*, 683 F.2d at 507 (footnote omitted) (quoting *Cowles Broadcasting, Inc.*, 86 F.C.C.2d 993, 1013 (1981)). These "justifications" are intended as aids in the Commission's decisional process. They do not replace the Commission's primary directive to act in the public interest. Indeed, there may be circumstances where the public interest requires a renewal expectancy although all the justifications are not affirmatively shown. Simply, the three guidelines are not rigid tests to be met by each applicant. This is reflected in our *Central Florida II* decision where we did not require, for example, the incumbent to show that restructuring would occur or that investment in the station was of a certain level. We turn then to the guidelines and their applicability to this case.

The first justification for a renewal expectancy reflects a concern over the unknown quality of the challenger. Because of this uncertainty, a denial of the incumbent's license renewal application may "deprive the community of an acceptable service and replace it with an inferior one." *Id.* Victor presses the argument that denial of a duplicating station's license will never deprive the community of an acceptable service because the meritorious programs will still be available on the originating station. The argument is unpersuasive, at least if the duplicating station provides some independent programming. If the station provides independent programming,

the fact that the challenger *proposes* more hours of non-entertainment programming than the incumbent *offers,* does not automatically entitle the challenger to the incumbent's license. The Commission could reasonably conclude that the public interest would not be served by replacing a known-quality service with a greater amount of possibly inferior service. Simply, quantity may not always be better than quality.**

Applying this rationale to the instant case, the loss of WABZ's license would deprive the community of an acceptable service in that it would directly lead to the loss of approximately 31 minutes per day of non-entertainment programming—programming that was "particularly responsive to the needs of Albemarle." *Hearing, supra,* 90 F.C.C.2d at 840. On a per day basis, the amount may appear *de minimus.* However, 31 minutes per day translates into over 180 hours per year of known-quality programming. And, all of the 180 hours of service is provided at times convenient to the public. A conclusion that this is acceptable service is not unreasonable. On the other side of the equation, Victor offered only paper proposals. As with all proposals, uncertainty exists as to whether the promises of future behavior will be kept. In this case, those uncertainties were heightened by Victor's numerous violations of FCC rules. The Commission thus acted properly when it decided to not heavily weigh Victor's proposed services.

▪ We are being urged by Victor and the dissent to hold that 180 hours of independent non-entertainment programming can never be considered an acceptable level of service. To so hold would vastly and improperly expand the court's role. Indeed, this suggestion would place us in the business of superimposing quantitative parameters on the FCC's discretion. Our review power surely does not allow us to engage in a *de novo* quantitative analysis. Such an analysis is firmly entrusted to the agency—that body with experience in the field and with full access to all relevant material. So long as the agency articulates its reasons and engages in reasoned decision-making, the court should not second-guess the FCC's determination of an acceptable level of service.

The second rationale for a renewal expectancy is that it encourages investment in the station, which in turn ensures quality service. With duplicating stations, the financial investment that ensures quality service may be the duplicating station itself. That is, the duplicating station may be a source of revenues necessary to ensure the quality service of the originating station. Without the duplicating station's funds, the originating station might not be able to remain on the air or, alternatively, might not be able to offer the same quality of programming. In the instant case, WABZ did not prove that its duplication was economically necessary. Thus, Victor argues that there should be no renewal expectancy. In so arguing, Victor misconstrues *Cowles Broadcasting:* continuing investment is one method to gauge the public interest; it is not a requirement in itself. It would be nonsensical to require that despite a high quality of service to the public, WABZ should lose its license because it did not invest some unknown amount of cash in the station. Moreover, if each applicant had to prove as a prerequisite to license renewal

** The dissent, *infra,* assumes that a station which stays on the air longer will always provide a better service to the public: "[T]he only program service lost would be the thirty-one minute average per day of original non-entertainment programming and the additional minutes of other unspecified entertainment transmissions. That might be considered a cheap price to pay for twenty-four hours of new and different programming...." Dissenting Opinion, *infra,* at 775. Assuming *arguendo* that this court should become involved in any *de novo* balancing, the dissent's assumption that more is always better is groundless. A few examples illustrate this: a challenger could propose more programming, but could schedule all its non-entertainment, public interest programming at times not convenient to the listening public; a challenger could propose more programming but could air shows with no interest to its audience; a challenger could propose more programming but then fall short of its proposal. In all instances, the public interest would be better served by the incumbent station that offers less.

an additional investment in the station, the agency might find itself in the uncomfortable position of requiring unnecessary expenditures. We decline to impose this requirement.

The final justification for the renewal expectancy is the avoidance of haphazard industry restructuring. That is, the public interest is advanced if there is no rapid turnover of licensees. In the instant case, Victor points to no evidence that weakens this rationale. As in the FCC's decision in *Cowles Broadcasting,* affirmed by this court in *Central Florida II,* the Commission made no finding that restructuring would or would not occur.

 Program duplication does not inevitably foreclose a conclusion that the public interest would best be served by a renewal of the duplicating station's license. In part, we reach this result because program duplication does not inherently undercut the *Cowles Broadcasting* guidelines. More importantly, however, we reach this result because we can envision the situation where the public interest is best served by the duplicating station's remaining on the air, despite the applicant's inability to affirmatively prove each guideline. Indeed, the case *sub judice* presents such a situation. Here, the strongest support for WABZ's renewal expectancy is that policy which reflects a concern over replacing an acceptable level of service with possibly inferior service. That policy deserved special weight in this case because WABZ's past performance was "superior"—as opposed to average or substantial—and because Victor's proposal had to be examined against its previous inattention to FCC rules. The possibility clearly existed that the public would be harmed if WABZ lost its license. Accordingly, the Commission acted reasonably when it granted WABZ a renewal expectancy. Neither Victor nor the dissent have demonstrated why the financial investment or haphazard restructuring guidelines are relevant to a determination of the public interest under the particular facts in this case.

### 2. *The Comparative Analysis*

Victor's second argument is that the Commission improperly conducted the comparison between the contestants. In addition to superior performance, diversification and integration were the Commission's primary focus. We briefly review the Commission's treatment of these factors as a prelude to our examination of the FCC's comparative analysis.

Rather than arbitrarily announcing a weight to be given to Victor's "preference" for integration and diversification, the FCC carefully considered the record and clearly articulated its reasoning. *See Hearing,* 90 F.C.C.2d at 830–33. In each instance, the Commission first determined which party had the preference, and then considered the significance of any mitigating factors. Thus, for example, the Commission determined that the common ownership of Victor and other radio stations in the region—although not in the broadcast area—somewhat diluted Victor's preference for diversification of media ownership. *Id.* at 831. Similarly, the Commission reasoned that a series of FCC rule violations committed by Victor's proposed manager "demonstrated indifference to [FCC] reporting requirements" and thus diminished Victor's "preference" for integration of ownership and control. *Id.* at 833. The Commission also examined the extent of the competitors' broadcast range and concluded that Victor was to be preferred because it reached a larger geographic area. *Id.* at 834. At the same time, the FCC found that the extra territory Victor reached already was serviced adequately, and therefore reduced the weight of Victor's range preference. On the other side of the balance, the Commission assessed a moderate comparative demerit against WABZ for its duplicative programming. The FCC found that WABZ had offered no justification for this inefficient use of the frequency. Moreover, the duplicative broadcasting "detract[ed] somewhat from [WABZ's] past broadcast record." *Id.* at 842. However, the Commission concluded that duplication did not preclude a conclusion that WABZ's broadcast

record had been meritorious. In part, the FCC based this result on its rules that allow 100% duplication in small communities such as Albemarle. *AM Station Assignment Standards,* 2 RAD.REG.2d (P & F) 1658, 1676 (1964).

The FCC then integrated all the above factors into an "overall comparative evaluation." Victor, the challenger, received a "preference" for integration of ownership, a "preference" for diversification, a "slight credit" for comparative coverage, and a "moderate comparative demerit" for numerous reporting violations. In contrast, WABZ, the incumbent, received a "particularly strong comparative preference" arising from its renewal expectancy and "a moderate demerit" for program duplication.

To determine whether the FCC's results were reasonable, we cannot merely tally the number of merits and demerits on each side. As we recognized, and approved, in *Central Florida II,* the FCC's policy is to weigh the structural factors of diversification and integration less than it weighs a renewal expectancy. 683 F.2d at 509. Indeed, in that case we affirmed a license renewal after a comparative hearing had returned results similar to those in the case *sub judice.* The challenger had preferences for diversification and integration while the incumbent had a record of substantial performance. The incumbent, however, also had received a demerit for an illegal studio move. *Id.* Because diversification and integration are less weighty than past performance, the FCC granted the renewal expectancy. There, we accepted the FCC's conclusion. Similarly, we here conclude that the FCC's balancing was not unreasonable.

The Commission was explicit in its balancing and careful in its explanation of the offsetting merits. Throughout its analysis, the Commission correctly focused on the public interest and not on the interest of the incumbent. It *may* be that Victor would provide better service. But this is a judgment within the discretion of the Commission that we should not—and indeed cannot—second-guess. It was not unrea-

sonable for the Commission to conclude that the public would be better served by a station which had a superior performance record, but which broadcast only a small amount of independent programming, than by a station which was only a paper proposal and which already had evinced an inattention to FCC regulations. The dissent would have us rigidly apply the guidelines established by the Commission, and ratified by this court, as if those guidelines were a three-part mold into which every renewal expectancy must fit. We have not so read the Commission policy about license renewals in the past and we have no authority to impose such a policy upon the Commission in this case. The touchstone allowing for a renewal expectancy must be a benefit to the public. That benefit can be found even if the route differs from the talismanic approach urged by the dissent.

## III. CONCLUSION

We find that the Commission carefully explained its analysis, and that its findings were supported by the record and were reasonable. We thus affirm the Commission.

Our holding, however, does not sound a retreat from our concern about "automatic license renewal." Our review will continue to probe the Commission's procedures to ensure that it does not revert to an irrebuttable presumption in favor of the incumbent. Whether the Commission uses the tripartite guidelines of *Cowles Broadcasting* or a different analysis, it must reasonably find that the public interest will be served by granting a renewal expectancy. Our decision today merely reflects our conclusion that, in this case, the FCC met the requirement for reasoned decision-making in the performance of its function.

*Affirmed.*

WILKEY, Circuit Judge, dissenting:

The issue raised in this appeal is one of first impression: whether the Federal Communications Commission may, consistently

with the Communications Act,[1] grant a strong renewal expectancy to an incumbent FM radio station proposing to broadcast little more than the duplicated programming of a sister AM station covering the same area, when the incumbent broadcaster is challenged by a station which proposes original programming.

While the precise issue confronted today is new, the principles governing both duplicative broadcasting and the use of a renewal expectancy in a comparative hearing for license renewal are well established. The Commission and this court have held that a licensee is entitled to a renewal expectancy only when the interests of the listening public—as opposed to the incumbent broadcaster—would be harmed if incumbency were not considered in balancing comparatively the merits of the two proposals. The Commission has previously examined the problems associated with the allocation of scarce FM frequency space to stations offering to rebroadcast the canned programming of AM stations and concluded that, absent strong countervailing factors, this wasteful practice does not serve the public interest.

Yet, in its singleminded determination to renew the licenses of incumbent broadcasters, the Commission ignored these prior pronouncements and held that radio station WABZ, which does little more than rebroadcast 100% of the programming of WWWX, a separate AM station in the same small town, must be allowed to continue this inefficient use of its assigned channel even though the Commission found that (1) WABZ would have better served the public interest had it provided more original programming during the license period, and (2) not only did the challenging applicant, Victor Broadcasting, offer *more* original programming, it proposed to broadcast that programming to a significantly larger audience than that reached by the incumbent station.

In clear violation of the Communications Act, the FCC reached this result by granting WABZ–FM a particularly strong renewal expectancy based on its alleged meritorious programming, without any independent consideration of WABZ's own separate contribution to the interests of the listening public. Because the Commission applied this renewal expectancy without considering whether WABZ's proposal satisfied the test the Commission itself has designed to assure that renewal expectancies operate in favor of the public interest, the decision perpetuates WABZ–FM's redundant programming at the expense of the public interest in diversity. To compound the error, the Commission gave no reasonable explanation for its refusal to discount its assessment of WABZ's broadcast record; its own finding was that the duplicated broadcasts were wasteful.

The decision was not only wrong and indefensible; there was no reasonable defense offered. Painstaking and explicit balancing[2] on scales that have been fixed to operate only in the incumbent's favor is no balancing at all. I respectfully dissent from the majority's affirmance of the Commission's decision, which threatens to reinshrine the previously rejected practice of automatically renewing broadcast licenses without any meaningful inquiry into the public interest.

## I. BACKGROUND

As part of its ongoing duty to administer radio broadcasting the Federal Communications Commission has gradually evolved two complex series of policies governing (1) permissible broadcasting duplication and (2) comparative hearings for challenged license renewals. Before considering the problems raised in this proceeding by the intersection of these two aspects of broadcast policy, it is important to review briefly the relevant statutory, judicial, and agency guideposts that demarcate the perimeters within which the Commission operates to serve the public interest.

---

1. 47 U.S.C. §§ 301–330 (1976 & Supp. V 1981).

2. Majority Opinion, at 758.

## A. The Permissible Use of a Renewal Expectancy

Upon a showing that its proposal will serve the public interest, a qualified applicant may obtain a license to operate a radio station on an available frequency.[3] However, the Communications Act strictly limits the duration of broadcast licenses, and requires that the Commission review applications for renewal to determine whether continued broadcasting would serve the public interest.[4] Other parties may challenge the incumbent's application for license renewal; when an applicant demonstrates that it would be qualified to operate a radio station, the Commission must accord a full hearing to both parties, evaluating comparatively those criteria that the Commission has decided most accurately predict which applicant's proposal will better serve the public interest.[5] Among the indicia currently identified by the Commission as most closely correlating to the public interest are: diversification of media ownership; integration of ownership and management; the incumbent's past broadcast record; and "best practicable service," which includes such factors as the technical efficiency of the proposed frequency use, the proposed area of coverage, the number of people to be served, and the amount of programming duplication.[6]

Because the issuance of a broadcast license does not confer any proprietary interest in the licensee,[7] a license entails no right of renewal. However, the public interest standard of the Act does recognize a "renewal expectancy," which under limited circumstances permits the Commission to attach some weight to the fact of incumbency when considering an application for renewal in a comparative hearing.[8] The Commission has most recently explained the basis for granting a license renewal expectancy in *Cowles Broadcasting, Inc.*:

> (1) There is no guarantee that a challenger's paper proposals will, in fact, match the incumbent's proven performance. Thus, not only might replacing an incumbent be entirely gratuitous, but it might even deprive the community of an acceptable service and replace it with an inferior one. (2) Licensees should be encouraged through the likelihood of renewal to make investments to ensure quality service. Comparative renewal proceedings cannot function as a "competitive spur" to licensees if their dedication to the community is not rewarded. (3) Comparing incumbents and challengers as if they were both new applicants could lead to a haphazard restructuring of the broadcast industry especially considering the large number of group owners. We cannot readily conclude that such a restructuring could serve the public interest.[9]

When these prerequisites are satisfied, the Commission is entitled to grant a preference to the incumbent in the comparative renewal hearing. This preference usually takes the form of attaching extra weight to the past record criterion. As we explained in *Central Florida Enterprises, Inc. v. FCC*

3. *See* 47 U.S.C. §§ 307(a), 309(a) (1976).

4. *Id.* § 307(d) (Supp. V 1981).

5. *See Ashbacker Radio Corp. v. FCC*, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945); *Formulation of Policies Relating to the Broadcast Renewal Applicant, Stemming from the Comparative Hearing Process*, 66 F.C.C.2d 419, 420 (1977), *aff'd sub nom. National Black Media Coalition v. FCC*, 589 F.2d 578 (D.C.Cir.1978) [hereinafter cited as *Broadcast Renewal Applicant*].

6. *See Broadcast Renewal Applicant*, supra note 5, 66 F.C.C.2d at 430; *Policy Statement on Comparative Broadcast Hearings*, 1 F.C.C.2d 393 (1965); *see also Radio Station WABZ, Inc.*

(Decision by the Comm'n), 90 F.C.C.2d 818 (1982) [hereinafter cited as *Decision*] (applying these criteria).

7. 47 U.S.C. § 301 (1976); *Broadcast Renewal Applicant*, supra note 5, 66 F.C.C.2d at 420.

8. *Federal Communications Comm'n v. National Citizens Comm. for Broadcasting*, 436 U.S. 775, 805–06, 98 S.Ct. 2096, 2117–18, 56 L.Ed.2d 697 (1978).

9. *Cowles Broadcasting, Inc.*, 86 F.C.C.2d 993, 1013 (1981), *affirmed, Central Florida Enterprises, Inc. v. FCC (Central Florida II)*, 683 F.2d 503 (D.C.Cir.1982), *cert. denied*, — U.S. —, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983) (footnote omitted).

*(Central Florida II),* the "renewal expectancy is to be a factor weighed with all the other factors, and the better the past record, the greater the renewal expectancy 'weight.' "[10] However, the weight of the renewal expectancy is often controlling, since the diversification and integration factors are assigned a lesser weight in the comparative renewal process.[11]

Although a renewal expectancy has the incidental effect of favoring incumbent broadcasters, *the only legitimate purpose for adopting a renewal expectancy is to avoid harming the public interest.*[12] The focus of the renewal expectancy must therefore be prospective rather than retrospective: it must be used *only to the extent it predicts* that continued service by the licensee will better serve the public interest during the next term, and not because the public interest was met during the expired term.

The renewal expectancy must never be allowed to short-circuit the weighing of public interest criteria in the comparative hearing required by the Communications Act.[13] A renewal expectancy is lawful only when it correlates with the likelihood that an incumbent would prevail in a fully comparative inquiry.[14] Our prior decisions have rejected analysis of the Commission that assigned an importance to the renewal expectancy which effectively choked off meaningful inquiry into diversification, integration, best practicable service, and the other public interest criteria.[15] Thus, the Commission may not ignore its findings on best practicable service and diversification without clearly articulating a basis on which to conclude that the incumbent's record establishes that it is more likely to serve the public interest.[16]

## B. *Duplication of Programming*

Because this is the first opportunity the Commission has had to consider whether it may grant a license renewal expectancy to an applicant proposing duplicated programming, the relationship between broadcast duplication and the public interest must also be explored before reviewing the Commission's faithfulness in applying the license renewal expectancy within the narrow limits permitted by the Communications Act. Duplication of programming was originally allowed during the infancy of FM service as a temporary measure to help establish a financially independent network of FM stations.[17] It is usually proposed by an FM station affiliated with an AM station operating in the same community. By rebroadcasting, often simultaneously, the identical programs offered by the originating station, the duplicating station is able to generate additional advertising revenues at a fraction of the cost of maintaining the separate staff and equipment necessary to produce original programming.

Since duplicated broadcasts occupy two separate channels to bring only one program to one audience, the Commission has never regarded duplication as an efficient use of the FM spectrum.[18] The burdens imposed by this redundancy became apparent to the Commission as the demand for FM broadcast licenses began to outstrip the

**10.** *Central Florida II,* 683 F.2d at 506.

**11.** *See Cowles Broadcasting, Inc.,* 86 F.C.C.2d at 1015–17 (1981).

**12.** *See Central Florida II,* 683 F.2d at 507, 510; *Cowles Broadcasting, Inc.,* 86 F.C.C.2d at 1012.

**13.** *Central Florida Enterprises v. FCC (Central Florida I),* 598 F.2d 37, 42–43 (D.C.Cir.1978), *cert. dismissed,* 441 U.S. 957, 99 S.Ct. 2189, 60 L.Ed.2d 1062 (1979).

**14.** *Id.* at 57.

**15.** *See Citizens Communications Center v. FCC,* 447 F.2d 1201, 1203 n. 3 (D.C.Cir.1971),

*clarification granted,* 463 F.2d 822 (D.C.Cir. 1972); *Broadcast Renewal Applicant, supra* note 5, 66 F.C.C.2d at 422.

**16.** *Central Florida I,* 598 F.2d at 53–57.

**17.** *Amendment of Part 3 of the Commission's Rules, Regarding AM Station Assignment Standards and the Relationship Between the AM and FM Broadcast Services,* 25 Rad.Reg. (P & F) 1615, 1622–24 (1963) [hereinafter cited as *1963 AM Station Assignment Standards* ].

**18.** *Id.*

availability of frequency space.[19] As early as 1963 the Commission tentatively concluded that duplication had fulfilled its functions and began to consider limiting the extent of duplicated programming that could be offered by broadcasters.[20] By 1964 the Commission issued a rule prohibiting FM stations located in cities with a population over 100,000 from duplicating more than fifty percent of their average weekly broadcast programming.[21]

Over the next ten years, as the Commission tracked the burgeoning popularity of FM stations, the Commission recognized that it was no longer necessary to permit duplicative broadcasting in medium-size cities.[22] The Commission discovered that its rule prohibiting duplication caused a salutory chain reaction which stimulated the development of independent FM stations: the popularity of individual FM stations tended to increase with the amount of separate programming, generating higher revenues, and permitting the stations to offer more independent programming of higher quality.[23] In 1976 the Commission issued a new rule designed to reduce the permissible level of duplication to twenty-five percent for all FM stations operating in a community with a population over 25,000.[24] Substantially the same rule is currently in effect.[25]

Although the Commission permits duplication in smaller cities, it has never held that duplication in these communities is uniformly in the public interest. Thus, an application for a construction permit that proposes duplicated programming is *presumed to be "wasteful, inefficient, and undesirable."* [26] To overcome this adverse impact the applicant must show substantial benefits compensating for the disadvantages of the duplication. Some of the potentially offsetting factors include financial necessity, the type of programming duplicated, or the timing of the rebroadcasting to reach different audiences.[27] These same criteria are also considered by the Commission when weighing the merits of an incumbent licensee's proposal to continue duplicated broadcasting.[28]

### C. The Decision to Grant a License Renewal

Against this legal background governing duplicative broadcasting and the permissible use of a license renewal expectancy, the Commission considered the merits of the applications presented by the incumbent WABZ–FM and challenger Victor Broadcasting ("Victor"). WABZ is an FM station located in Albemarle, North Carolina, the county seat and principal retail center in Stanly County. Besides WABZ–FM the only other radio stations operating in Albemarle are the affiliated station WWWX, and the independently owned WZKY, both of which broadcast during daylight hours on the AM band.[29]

Before comparatively evaluating the applications of Victor and WABZ–FM the Commission determined that Victor was fully qualified to operate the FM station on the twenty-four hour basis which it pro-

**19.** *Amendment of Part 73 of the Commission's Rules, Regarding AM Station Assignment Standards and the Relationship Between the AM and FM Broadcast Services (Report & Order),* 45 F.C.C. 1515, 1532 (1964) [hereinafter cited as *1964 Report & Order*].

**20.** *See 1963 AM Station Assignment Standards, supra* note 17, 25 *Rad.Reg.* (P & F) at 1624–25.

**21.** *1964 Report & Order, supra* note 19, 45 F.C.C. at 1530–31, 1533.

**22.** *See AM–FM Program Duplication (Notice of Proposed Rulemaking),* 46 F.C.C.2d 277, 279–80 (1974).

**23.** *Id.* at 279.

**24.** *AM–FM Program Duplication (Report & Order),* 59 F.C.C.2d 147 (1976).

**25.** *See* 47 C.F.R. § 73.242 (1982).

**26.** *Jones T. Sudbury,* 8 F.C.C.2d 360, 362 (1967).

**27.** *Id.*

**28.** *See Decision, supra* note 6, 90 F.C.C.2d at 835–36; Brief for Appellee at 13 n. 23.

**29.** *Decision, supra* note 6, 90 F.C.C.2d at 830.

posed.[30] The Commission then marshalled the facts and made a comparative assessment of both proposals in each of the several categories it has designated in reviewing license renewals. Considering diversification of media ownership first, the Commission awarded a clear preference to Victor, since Victor would add a third media voice to the community while a renewal of WABZ–FM's license would merely preserve the status quo.[31] However, because Victor had committed a number of reporting violations during the pendency of its application, the Commission assessed a moderate comparative demerit against Victor.[32]

Under the heading of "Best Practicable Service" the Commission evaluated integration of ownership and management, comparative coverage, and program duplication. It awarded Victor a slight preference for integration, since Victor's majority owner intended to serve as the station's general manager. The Commission also assigned Victor a slight preference for its superior coverage, which would have extended service to thirty percent more people than currently reached by WABZ–FM.[33] The Commission next considered the extent to which Victor and WABZ–FM proposed duplicative programming. Victor offered to broadcast twenty-four hours of original programming per day. In contrast, WABZ–FM offered almost no original programming, intending to rebroadcast simultaneously all of the programming offered by WWWX on the AM band. WABZ–FM offered original programming only during the brief early morning and late evening periods that its sister AM station was not broadcasting. The Commission examined WABZ's application for evidence of countervailing benefits offsetting the inefficiencies of this duplication. Finding the record

devoid of any mitigating circumstances, it levied a moderate comparative demerit against WABZ.[34]

The final area analyzed was the past broadcast record of WABZ–FM. The Commission considered WABZ's programming to be particularly responsive to the needs of Albemarle. The high percentage of non-entertainment programming included reports by elected representatives and public service organizations, as well as regular agricultural and religious spots. This programming received favorable comments from individuals testifying in WABZ's favor, and the Commission found that WABZ's "noteworthy" reputation in the community deserved a "particularly strong comparative preference," [35] in spite of the redundancy of WABZ's programming.[36] However, the Commission did not advert to any witnesses or commenting listeners who testified favorably about specific original programming, or who otherwise distinguished between the original and duplicated programming.

After compiling each of these preferences and demerits, the Commission made an overall comparative evaluation, finding that "Victor's advantages under diversification and best practicable service are insufficient to overcome its demerit for the reporting violations and WABZ's distinct preference for past broadcast record as diminished by its moderate demerit for proposed program duplication."[37] Concluding that WABZ would better serve the public interest, the Commission granted WABZ's application for renewal and denied Victor's application for a construction permit.

Victor's appeal of the Commission's decision presents this court with its first opportunity to determine whether the license renewal expectancy policy announced in

---

**30.** *See id.* at 828.

**31.** *Id.* at 830.

**32.** *Id.* at 825–27.

**33.** *Decision, supra* note 6, 90 F.C.C.2d at 834; *see also Radio Station WABZ, Inc.* (Initial Decision by Administrative Law Judge), 90 F.C.C.2d 849, 876 (1982).

**34.** *Id.* at 834–36.

**35.** *Id.* at 841–42.

**36.** *Id.* at 843.

**37.** *Id.* at 846.

*Cowles Broadcasting* and affirmed in *Central Florida II* is being fleshed out in a manner that protects broadcast consumers. We noted in *Central Florida II* that the "definition and level of service" giving rise to a renewal expectancy would merit special attention.[38] Accordingly, the Commission's decision must be evaluated to determine whether, given the Commission's substantial discretion to assign a license renewal expectancy, its conclusion that a duplicating broadcaster is entitled to a strong renewal expectancy conforms to the strict public interest standard of the Communications Act.

## II. ANALYSIS

When one examines the Commission's decision, it is immediately apparent that the dispositive factor in the comparative balance was the extremely high weight assigned to the renewal expectancy based upon the Commission's evaluation of WABZ's past broadcast record. The Commission adopted the conclusion of the administrative law judge that Victor would have prevailed if both applicants had been seeking construction permits.[39] Nevertheless, because "the renewal situation raises different considerations from a purely prospective evaluation,"[40] the Commission awarded a "particularly strong comparative preference" to WABZ based on the renewal expectancy derived from its "superior" and "meritorious" past broadcast service.[41] It was this factor, diminished by WABZ's demerit for duplication, which outweighed *preferences for Victor in every other comparative criterion* evaluated by the Commission, with the sole exception of Victor's demerit for reporting violations.

I thus analyze the application of the renewal expectancy from three different viewpoints: whether the Commission properly concluded that the prerequisites for granting a renewal expectancy were satisfied; whether the Commission erred by considering what was essentially the broadcast record of the AM station in evaluating the renewal of an FM station's license; and whether the Commission rationally concluded that WABZ–FM's broadcast record was not vitiated by its extensive duplicative programming.

### A. Prerequisites for a License Renewal Expectancy

It is beyond dispute that a renewal expectancy may not be based upon the fact of incumbency *per se;* it must be grounded on the broadcast record, and is *relevant only to the extent it directly correlates to the likelihood of future service in the public interest.* The three-part test of *Cowles Broadcasting* upheld in *Central Florida II* identifies the three "[public] interest reasons"[42] that "justify"[43] the attachment of greater significance to the broadcast record of the incumbent. When these criteria are not clearly articulated by the Commission there is a danger that the Commission's decision may be based upon an irrebuttable presumption favoring incumbents.[44] When the facts satisfying the criteria are totally absent from the record, the use of a renewal expectancy is unjustified, and reflects an impermissible favoring of the licensee.

The Commission's consideration of the three-part *Cowles Broadcasting* test in this proceeding was superficial at best. It merely restated the three criteria and assumed that they were satisfied under the facts it had found. I examine each element of the test to determine whether the Commission could have rationally concluded that the underlying rationale for applying a license renewal expectancy was satisfied in this case.

---

38. 683 F.2d at 508.

39. *Decision, supra* note 6, 90 F.C.C.2d at 819–20.

40. *Id.* at 843.

41. *Id.* at 840, 845–46.

42. *Id.* at 845, Joint Appendix at 111.

43. *See Cowles Broadcasting, Inc.,* 86 F.C.C.2d at 1013.

44. *See Central Florida I,* 598 F.2d at 51.

## 1. Deprivation of Proven Broadcast Service

The first prong of the *Cowles Broadcasting* test states that the renewal expectancy may be used when "[t]here is no guarantee that a challenger's paper proposals will, in fact, match the incumbent's proven performance. Thus, not only might replacing an incumbent be entirely gratuitous, but *it might even deprive the community of an acceptable level of service and replace it with an inferior one.*"[45]

Under the facts found by the Commission, there is no possibility that the denial of WABZ's application for renewal would deprive Albemarle of an acceptable level of service. The vast majority of WABZ's programming would continue to be broadcast by WWWX at the same time, and to the same audience that now receives it over WABZ. The majority argues that thirty-one minutes of "particularly responsive" non-entertainment programming per day could be lost, and that an acceptable level of service is thus at risk.[46] However, the Commission made no finding that this specific nonduplicated programming at issue was "responsive" or of a high quality.[47] More importantly, the Commission itself scrupulously avoided any suggestion that either this half hour or WABZ's other miscellaneous original programming alone qualified as an "acceptable level of service." It verges on absurdity to suggest that the level of programming produced by a qualified applicant with substantial experience in the broadcasting field is likely to fall so far short of its paper proposal that it would be inferior to WABZ's meager original program offerings regardless of the quality of the incumbent's original programming, and there is no support in the record for such a finding.[48]

The majority places great weight on the fact that Victor's "paper" proposal was unproved, arguing that the Commission could therefore reasonably conclude that the public interest would be better served by the incumbent. However, the Commission did not stress this factor, and could not properly have done so. If, as the majority advocates, the first prong of the *Cowles Broadcasting* test focused narrowly on the unproved nature of the challenger's proposal rather than on the risk that proved services will be lost, the renewal expectancy would forever endow incumbents, since all incumbents can rely on their past broadcast records to prove their service, while challengers are limited to offering "paper" proposals. This, of course, is precisely the sort of renewal expectancy based on incumbency *per se* which our prior decisions in the *Central Florida* cases sharply rejected.

## 2. Encouraging Investment in Quality Programming

The second element of the test recognizes that licensees must be rewarded when they make investments to provide quality programming: "Licensees should be encouraged through the likelihood of renewal to make investments to ensure quality service. Comparative renewal proceedings cannot function as a 'competitive spur' to licensees

---

**45.** *Cowles Broadcasting, Inc.,* 86 F.C.C.2d at 1013 (emphasis added); *see also Federal Communications Comm'n v. National Citizens Comm. for Broadcasting,* 436 U.S. 775, 805, 98 S.Ct. 2096, 2117, 56 L.Ed.2d 697 (1978) (preserving the continuity of meritorious service furthers the public interest).

**46.** Majority Op. at 763. This amount is *de minimis* whether calculated on a daily basis or aggregated over a year, as the majority prefers to do. *Id.*

**47.** The Commission noted only that one five minute agricultural program, broadcast on some days as an original program but duplicated on other days, was of "special interest" to the listening audience. *See Decision, supra*

note 6, 90 F.C.C.2d at 837, Joint App. at 172–77.

**48.** I agree with the majority's observation that "the court should not second-guess the FCC's [reasoned] determination of an acceptable level of service" (Majority Op. at 763), but point out that the Commission made no determination—reasoned or otherwise—that the unduplicated programming was an acceptable level of service. Thus, my conclusion that the record could not support such a finding is no more a second-guessing of the Commission than the majority's assertion that the Commission could reasonably have found the contrary.

if their dedication to the community is not rewarded." [49]

Just as denying a renewal expectancy has no adverse effect on the *perpetuation* of quality programming under the first prong of the *Cowles Broadcasting* test, rewarding a duplicator with a renewal expectancy has no direct effect on the *origination* of quality programming under the second prong. A record of duplicated broadcasting unmitigated by financial necessity can only represent a decision *not* to make the investment necessary to produce high quality original programming. If dedication to the public is measured by the financial commitment ordinarily necessary to produce quality programming, then it is clear that the only station which is entitled to a reward is the originating station. The direct result of granting a renewal expectancy here will be to reduce the amount of quality programming originated under the prodding of the "competitive spur": if duplicating broadcasters know that they will get a renewal expectancy despite a challenge by a nonduplicator, there is very little incentive to invest the money necessary to originate their own programming.

Since WABZ began broadcasting in 1958 it has not made any investment to increase the level of its original programming. It is thus not entitled to rely on the second prong of the *Cowles Broadcasting* test as a justification for a renewal expectancy. The majority rationalizes WABZ's failure by arguing that an otherwise qualified applicant for renewal should not necessarily be required to demonstrate additional capital investments to qualify for a license renewal.[50] However, the Commission cannot cite the need to encourage these investments as a reason to grant a renewal expectancy, and then totally fail to inquire into whether granting a renewal expectancy would in fact reward past investments. When the underlying rationale invoked by the Commission fails, then the renewal expectancy inevitably degenerates into a preference for the mere fact of incumbency. The court has previously rejected this result.[51]

3. *Haphazard Restructuring of the Broadcast Industry*

The third prong of the *Cowles Broadcasting* test is intended to protect the institutional community of the broadcast industry. "Comparing incumbents and challengers as if they were both new applicants could lead to a haphazard restructuring of the broadcast industry especially considering the large number of group owners. We cannot conclude that such a restructuring could serve the public interest." [52] In this case the Commission made no finding that any restructuring would occur. Rather, the record suggests the opposite. The Commission found that the marginal income derived from the duplicating station was not necessary to sustained operations by WWWZ.[53] The owner of WABZ would continue broadcasting in the same community even if the challenger is awarded the channel.[54]

From this analysis of the *Cowles Broadcasting* criteria, it is apparent that the underlying reasons for applying a renewal expectancy are simply not relevant in a comparative challenge to a duplicating incumbent. By mechanically applying these criteria to guarantee the creation of a renewal

49. *Cowles Broadcasting, Inc.,* 86 F.C.C.2d at 1013.

50. Majority Op. at 763–764.

51. *Central Florida I,* 598 F.2d at 50–51.

52. *Cowles Broadcasting, Inc.,* 86 F.C.C.2d at 1013.

53. *Decision, supra* note 6, 90 F.C.C.2d at 835–36.

54. The majority notes that in *Central Florida II* this court did not specifically inquire into whether this factor, or the other two, had been satisfied. In that case, however, it was obvious from the Commission's decision that each of these prongs was met: (1) all of the incumbent's broadcasting would have been lost, (2) the incumbent had materially improved the facilities it used to produce substantial amounts of local programming, and (3) the incumbent would have lost its sole station in the community. *See Cowles Broadcasting, Inc.,* 86 F.C.C.2d at 1005, 1008.

expectancy, the Commission has ignored our caveat in *Central Florida II* that the renewal expectancy must "be factored in for the benefit of the public, not for incumbent broadcasters." [55] Although a lawful renewal expectancy does not necessarily require that all these criteria be satisfied, in this case *none* of the three public interest policies that the renewal expectancy is designed to serve would be furthered by granting WABZ a renewal expectancy.

The majority argues that these criteria are only "aids" in the Commission's decision-making process, and that there might be other circumstances in which the public interest requires a renewal expectancy even though the *Cowles Broadcasting* criteria are not satisfied.[56] However, the Commission's opinion can hardly qualify as reasoned decision-making if the "aids" it relies upon have no factual support in the record. Moreover, the Commission has not identified those other circumstances that justify a renewal expectancy or explained how they are satisfied in this case. It is not our role to speculate about the existence of other unidentified situations in which a renewal expectancy might serve the public interest. The *Cowles Broadcasting* criteria remain the only articulated links between the public interest and a license renewal expectancy. When those links fail, as they do in this case, *Central Florida I* requires this court to remand the decision to the Commission for a rational explanation of how the renewal expectancy serves the public interest.

### B. *Nonoriginal Programming as a Source of the Incumbent's Broadcast Record*

The Commission based WABZ's strong renewal expectancy on its conclusion that WABZ's "superior" record demonstrated an "impressive commitment to serving the needs of Albemarle," [57] However, the Commission made no finding that WABZ's *own* programming had merit, or was superior in the level of service it gave to the public. In fact, the Commission never even considered the merits of WABZ's unduplicated programming, choosing instead to lump together the original and canned programs offered by WABZ.[58] Given the extremely limited nature of WABZ's original programming, which the Commission found insignificant enough to relegate to a passing footnote,[59] *it is clear that the Commission renewed the license of a separate FM station (WABZ) based on the performance of a different AM station (WWWX), rather than the FM station's own performance.* The result reached here by the Commission's combined consideration of AM and FM programming makes a travesty out of the concept of public interest under the Communications Act, and transforms the renewal expectancy into an incumbent's self-renewing ticket to broadcast redundant programming with little additional merit.

One cuts to the heart of the problem of defining the *public's* interest by asking, "If WABZ-FM went off the air today, what would the public miss?" The answer, apparent from the facts found by the Commission, is a few nightly minutes of live

55. 683 F.2d at 507.

56. Majority Op. at 762.

57. *Decision, supra* note 6, 90 F.C.C.2d at 839–40.

58. The Commission examined the non-entertainment programming offered by WABZ and relied on a large number of favorable listener comments *without identifying whether* the programs or comments originated from WABZ or WWWX. *Id.* at 840–42. The only facts found by the Commission relevant to the nonduplicated programming offered by WABZ were that "Station WABZ-FM broadcast non-duplicated programming at night, consisting primarily of local and syndicated religious programs, an oc-

casional special musical or religious event, and live coverage of local high school football games." *Id.* at 843 n. 139. The non-entertainment component of this original programming lasted an average of 31 minutes per day. *Id.* at 836. Although the Commission stated that "[t]his programming would not ... continue to be available regardless of the outcome," *id.* at 843 n. 139, there was no inquiry into whether either the original entertainment or nonentertainment programming served the public interest.

59. *Decision, supra* note 6, 90 F.C.C.2d at 843 n. 139.

high school football games, local and syndicated religious programs, and occasional special musical events.[60] This defines the real scope of WABZ's contribution to the public interest. It is simply unrealistic for the Commission to conclude that WABZ was entitled to a particularly strong preference when WABZ's only contribution to community listening was this very small quantity of programs broadcast above and beyond what the AM station was already offering under a separate license. Common sense suggests that if one polled the listening public to determine whether it desired two licensees operating the same program on AM and FM, or one licensee broadcasting an AM program and a separate licensee offering a different FM program, the result would favor diversity of programming.

Of course, no law requires the Commission to follow common sense. However, the Communications Act directs the Commission to select through a comparative hearing the broadcast applicant most likely to serve the public interest. Because the fixed range of frequencies absolutely limits the number of channels available for broadcasting, any definition of broadcast service in the public interest must either expressly or implicitly factor in the opportunity costs involved in assigning a channel to one applicant over another. By failing to isolate and remove from consideration WABZ's duplicated programming, the Commission effectively ignored the minimal opportunity costs associated with allocating WABZ's channel to a competitor. In other words, the only program service lost would be the thirty-one minute average per day of original non-entertainment programming and the additional minutes of other unspecified entertainment transmissions. That might be considered a cheap price to pay for twenty-four hours of new and different programming offered by the challenger Victor.[61]

There could be situations in which the Commission would be justified in considering both duplicated and original programming when evaluating the broadcast record of an incumbent station. In some cases the income derived from a duplicating station could be economically necessary to support the level of program quality offered by the original station. Other factors that might justify tandem consideration of AM and FM programming include the need to reach a particular audience, or the special subject matter of the duplicated programs.[62]

However, the Commission has already found in this proceeding that none of the potentially mitigating factors were present. Discussing the contention that economic ne-

60. See id.

61. Pointing out what the Commission might have held had it engaged in the balancing required by the Communications Act hardly involves this court in de novo balancing, or the substitution of our judgment for that of the agency. See Majority Op. at 763 n. **.

62. Jones T. Sudbury, 8 F.C.C.2d 360, 362 (1967). The majority advances two reasons to support the Commission's refusal to consider the original programming separately: (1) the Commission chose to "treat duplication elsewhere" instead of "address[ing] duplication in its initial analysis of past performance," and (2) the public itself did not differentiate between the original and duplicated programming, thus permitting the Commission to ignore the distinction when assessing the public interest. See Majority Op. at 761–762.

The first justification is manifestly wrong. Although the Commission devoted a brief section of its decision to an evaluation of the effect of duplication on the past broadcast record, see Decision, supra note 6, 90 F.C.C.2d at 842–43, it never considered the extent to which the original programming furthered the public interest. Moreover, the Commission's conclusions on this issue are not supported by reasoned analysis. See infra Section C.

The second reason is equally flawed. Although "none of the affiants limited their praise to the independent programming" (Majority Op. at 762), the Commission did not refer to any affiants who even mentioned the original programming. Thus, one can not be sure that the public's perception of WABZ's performance was an accurate one. For instance, the affiants whose testimony was relied upon may have been unaware that the broadcasting of their programs would continue on WWWX even if WABZ–FM ceased its operations. That the public may not have realized what was at stake in the comparative hearing should not permit the Commission to shut its eyes to the fact that the public would not lose most of the programming it already received over WWWX.

cessity required WABZ's duplication, the Commission held that "there was no evidence as to the profit situation of the two stations during the 1976–78 period which would justify the duplication . . . ."[63] Because WABZ served an area no larger than that reached by the AM station, "the duplication cannot be justified on the ground that programming carried simultaneously over the two frequencies reaches different audiences."[64] Finally, the duplication of WABZ was "indiscriminate": since it proposed to duplicate 100% of the AM programming on the FM station, including both entertainment and non-entertainment programming, WABZ failed to make any showing that the type of programming involved could justify its duplication. In effect, WABZ proposed a "wasteful and inefficient"[65] program, without any sort of mitigation.[66] As a matter of law, this level of service cannot generate a legitimate renewal expectancy.

### C. The Weight Assigned to the Broadcast Record

Even if a renewal expectancy could be properly granted in this proceeding, and even if the originating station's service in the public interest could be considered in assessing the merits of a duplicating incumbent's past broadcast record, I submit we are still forced to vacate the Commission's order because it has failed to articulate a rational basis for refusing to discount substantially the broadcast record and renewal expectancy of WABZ. Although the Com-

mission held out the hope that it would award a license to a challenger offering new programs that would better serve the public interest, it gave such great weight to WABZ's broadcast record and such little weight to the duplicative broadcasting that its review amounted to little more than a pretense.

This court cannot, in lieu of the Commission, balance the various factors which the Commission considers when making its public interest findings, or otherwise displace the Commission's decision-making function. But it can, and must, assure that the Commission's weighing of these criteria is not arbitrary or irrational. This court's only access to the balancing process is provided by the Commission's explanation of its reasoning. The Commission has previously concluded that duplicative broadcasting is wasteful and inefficient, and does not serve the public interest unless substantial countervailing benefits are shown. Thus, the Commission's decision must be examined to determine whether careful and reasoned analysis supports its conclusion that WABZ's duplicative programming was not entitled to great weight when evaluating its negative impact on WABZ's broadcast record.

The majority pays lip service to this principle, noting that the Commission must articulate its reasons and engage in "reasoned decision-making."[67] However, the majority never directly considers whether the Commission's articulation of its balancing

---

**63.** *Decision, supra* note 6, 90 F.C.C.2d at 835–36.

**64.** *Id.* at 836.

**65.** *Id.* at 835.

**66.** Seeking to create mitigating circumstances where the Commission found none to exist, the majority offers several hypothetical situations in which the Commission might find that a large quantity of original programming would not serve the public interest as well as a small amount of duplicated or original programming. Majority Op. at 763 n. **. However, the Commission made no mention of these circumstances. Thus, we cannot be sure that the Commission would agree with the majority's assertion that these hypothetical situations could fully

counterbalance the harm to the public interest inherent in duplicated broadcasting. Perhaps the Commission omitted to mention these situations only because the likelihood of their realization is so low that it never occurred to the Commission to consider them, and not because it would never find them to be mitigating circumstances. In any case, the Commission certainly did not base WABZ's license renewal on these remote possibilities. Even if it had, there is absolutely no evidence in the record suggesting that any of the majority's hypothetical examples were presented by Victor's challenge to WABZ.

**67.** Majority Op. at 763.

amounts to reasoned analysis consistent with the public interest goals elsewhere identified by the Commission.[68] The majority completely ignores the Commission's explanation of why WABZ's duplication "detracts only slightly" from its past broadcast record, and thus "does not preclude a finding that its overall broadcast record has been meritorious."[69] This conclusion was vital, since it enabled the Commission to load the scales of the comparative hearing with a "particularly strong" renewal expectancy. Because I believe that close examination can only expose the facade erected by the Commission in lieu of reasoned analysis, I set forth the crucial passage in full:

> Although we have held that an applicant proposing program duplication must show substantial countervailing benefits to avoid a comparative demerit, we have never specified what impact past duplication should have on a renewal applicant's overall broadcast record. *In our view, the renewal situation raises different considerations from a purely prospective evaluation. Whereas applicants for new facilities are free to tailor their proposals to meet the exigencies of a comparative proceeding, renewal applicants must run on their records.* In this case, the evidence indicates a superior record of service to the community. *Admittedly, the public interest would have been better served had Station WABZ–FM presented more non-duplicated programming. However, despite the inherent inefficiency, our rules permit 100% duplication in smaller communities such as Albemarle where the demand for FM frequencies is*

not great. Moreover, the grant of WABZ's unopposed 1972 renewal application proposing 100% duplication of its daytime-only AM programming was found to be in the public interest. Under these circumstances, WABZ's inefficient use of the AM frequency ... detracts only slightly from the station's overall broadcast record .... [70]

The most striking aspect of this passage is the Commission's admission that "the public interest *would have been better served* had Station WABZ–FM *presented more non-duplicated programming*"—exactly what the challenger proposes to do twenty-four hours per day. The past broadcast record—which is the basis of the renewal expectancy—is only relevant to the extent it predicts a similar future level of service; thus one must assume, as did the Commission, that WABZ's high level of duplication would remain the same. And yet, in granting WABZ's application for a license renewal, the Commission found that WABZ's proposal to continue this duplication "on balance" would "better serve the public interest,"[71] even in the face of a challenge by a station that proposed *exclusively* "nonduplicated programming." *I see no way to reconcile the Commission's admission and conclusion without admitting that the renewal expectancy was used to reward WABZ for its past service, and not to determine whether WABZ's continued broadcasting would meet the public interest.*

A second major flaw in the Commission's reasoning springs from the language that "the renewal situation raises different con-

**68.** The majority diverts attention from its unwillingness to inquire into the rationality of the Commission's reasoning by labeling this step as "second-guessing" the Commission, and by incorrectly arguing that Victor's position would "as a matter of law" prevent the Commission from finding a renewal expectancy in favor of a duplicating broadcaster. Majority Op. at 761, 765. However, neither Victor nor this opinion suggests that duplication *per se* precludes a renewal expectancy, but only that the Commission has not reasonably explained how a renewal expectancy would serve the public interest *in this particular situation.* The contention that an examination of the rationality of the

Commission's decision inevitably second-guesses the Commission is also meritless, since the Administrative Procedure Act not only permits but requires the court to examine the rationality of agency adjudications. *See* 5 U.S.C. § 706(2)(A) (1976).

**69.** *Decision, supra* note 6, 90 F.C.C.2d at 842–43.

**70.** *Decision, supra* note 6, 90 F.C.C.2d at 843 (footnotes omitted; emphasis added).

**71.** *Id.* at 845.

siderations from a purely prospective evaluation. Whereas applicants for new facilities are free to tailor their proposals to the exigencies of a comparative hearing, renewal applicants must run on their records." The meaning of these two sentences is far from clear. The passage apparently refers to the *Cowles Broadcasting* decision, in which the Commission held that diversification and integration are "structural matters" which cannot be given great weight in a comparative renewal hearing, since their susceptibility to favorable manipulation by challengers would otherwise result in the haphazard restructuring of the industry.[72] However, the extent of duplication is *not* a structural factor; it is an integral part of the broadcast record. A station may decide to duplicate, alter, reduce or increase its original programming without any change in the ownership or management of the station. The Commission itself has previously noted that some stations have voluntarily chosen to eliminate duplication.[73] It is thus hard to see how this aspect of the station's performance is more easily structured by challengers than incumbents. The Commission made no finding to that effect in this proceeding.

According to the Commission, *Cowles Broadcasting* also justifies a reduced weight to diversification and integration based on the "detriment involved in depriving the public of a proven service." [74] This second rationale is likewise inapplicable here, since the record does not suggest, and the Commission did not find, that denial of WABZ's renewal application would in fact deprive the public of any substantial service. By stating that "renewal applicants must run on their records," *and then foreclosing inquiry into this important aspect of the record,* the Commission has placed itself in the contradictory position of extolling the

heavy weight to be assigned to the past broadcast record, *while ignoring the real extent to which duplication adds or subtracts to the station's public service record.* It is painfully evident that the Commission is protecting duplicating incumbents from their records, rather than allowing them to run on their records.

The remainder of the Commission's reasoning only confirms this view. The Commission finds solace in the fact that its rules "permit 100% duplication in smaller communities such as Albemarle where the demand for FM frequencies is not great." Although lack of demand for FM stations may be a legitimate reason for not forbidding duplication in smaller communities, this rationale has no application in this proceeding, since Victor itself has demanded the use of the frequency spectrum assigned to WABZ. Further, although the rules permit duplicative broadcasting in relatively unpopulated communities, they do not encourage or even justify duplication. The Commission previously held that a comparative demerit must be assessed against an applicant for new broadcast facilities who proposes duplication, even though the rules permit duplication.[75] The Commission recognized in this proceeding that Victor would have prevailed over WABZ in a comparative hearing for a new broadcast license. In this comparative renewal hearing the Commission cannot then blithely rely on the fact that its rules permit duplication as a justification for its refusal to assign less weight to WABZ's broadcast record.

In reality the Commission has given absolutely no reasoned explanation of exactly how or why the continued duplication will serve the public interest. Its statement that "the grant of WABZ's unopposed 1972 renewal application proposing 100% duplica-

---

72. 86 F.C.C.2d at 1015–17.

73. *See 1964 Report & Order, supra* note 19, 45 F.C.C. at 1532 (noting that many stations voluntarily switched to program formats with less or no duplication after the Commission began to consider issuing rules limiting the amount of permissible duplication).

74. *See Decision, supra* note 6, 90 F.C.C.2d at 846.

75. *See Jones T. Sudbury,* 8 F.C.C.2d 360, 365 (1967) (Robert T. Bartley, Comm'r, dissenting) (arguing that a demerit should not be assessed against an applicant for a construction license that proposed duplication, since the rules did not prohibit the duplication).

tion ... was found to be in the public interest" is disingenuous. If every applicant for license renewal could rely on the Commission's finding that its initial proposal was in the public interest, then there would be no need for any subsequent comparative hearing, since *every* license granted by the Commission must be in the public interest. That the station carried out its proposal to duplicate 100% of its daytime programming should not be decisionally significant since the Commission has indicated that merely executing a proposed program does not justify a comparative preference for an applicant's past broadcast record.[76] Certainly the Commission's prior approval of WABZ's unchallenged proposal to duplicate its programming should not restrict the discretion of the Commission to conclude that further duplication would not serve the public interest. The Commission's apparent willingness to justify the renewal of a license on the grounds that the same programming was once found to be in the public interest comes close to re-establishing the automatic and irrebuttable expectancy of renewal our prior decisions have rejected.

CONCLUSION

The Commission's faithfulness in conducting comparative renewal hearings under the Communications Act is starkly exposed when the Commission is caught in the cross fire of conflicting listeners' and broadcasters' interests. It is evident to me that the Commission has abrogated its responsibility to renew broadcast licenses on the basis of

the public interest and not that of the incumbent licensee. The only party whose interests are furthered by WABZ's license renewal is WABZ itself. Clearly the public stands to lose: it is assured of the continued reception of virtually all of WABZ's programs whether WABZ continues broadcasting or remains forever silent; it is now also assured that no new programming will be heard.[77] For these reasons the Commission's decision should be vacated and remanded.

---

**76.** *See Policy Statement on Comparative Broadcast Hearings,* 1 F.C.C.2d 393, 398 (1965).

**77.** At oral argument no one was surprised to learn from FCC counsel that since 1961 the Commission has maintained its unblemished record favoring incumbent licensees over comparative challengers, except for one radio licensee in Massachusetts. *See Central Florida II,* 683 F.2d at 510 n. 38. Operating a one-man radio station at age 70, his past performance was held to predict a future performance inferior to the challenger's. *Simon Geller,* 90 F.C.C.2d 250, *reconsid. denied,* 91 F.C.C.2d 1253 (1982), *appeal pending, Committee for Community Access v. FCC,* No. 82–2314 (D.C.Cir. 1983). *All other* radio stations and *all* televi-

sion stations which have faced comparative challenges have been found by the Commission to be so good they do not need replacing.

One is reminded of the remark attributed to Theodore Roosevelt: "If the President of the United States were obligated, irrespective of cause and at his own free choice, to put to death one man every year, the powers of the Presidency would be vastly enhanced." If the Commission would screw up its courage to a height never before reached by that agency, and firmly resolve to deny just *one* incumbent out of thousands of license renewals each year, the quality of television and radio programming in America would be remarkably enhanced.