**Julie P. MINER, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee.**

No. 78–1903.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 15, 1979.

Decided Dec. 1, 1980.

Robert B. McKenna, Jr., Boston, Mass., with whom Glen A. Wilkinson and Rosel H. Hyde, Washington, D.C., were on the brief, for appellant.

James R. Jamison, Jr., Counsel, F.C.C., Washington, D.C., with whom Robert R. Bruce, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C., were on the brief, for appellee.

Sheldon M. Guttmann, Counsel, F.C.C., Washington, D.C., entered an appearance for appellee.

Before LEVENTHAL,* ROBB and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBB.

ROBB, Circuit Judge:

This case concerns the mutually exclusive applications of Julie P. Miner and Albert L. Crain for permits to construct a new radio station in St. George, Utah. The Federal Communications Commission (FCC) granted Crain's application and denied Miner's. We reverse.

Appellant Julie P. Miner is the licensee of standard broadcast (i. e., AM) radio station KDXU in St. George, Utah, which she and her husband have operated since 1968. They are natives of the area and have lived in St. George since 1968. St. George has a population of 7,097, and is the largest com-

* Circuit Judge Leventhal, a member of the panel which heard oral argument in this case, died before the case was decided.

munity within Washington County, which has a population of 13,669. KDXU operates at a power of 1 kilowatt daytime and 250 watts nighttime on a frequency of 1450 kilowatts. In 1973 Miner also applied for and received a license to operate KDXU–FM as a 3 kilowatt FM radio station in St. George on a frequency not then in use by any broadcaster.

On November 28, 1973 Miner filed with the FCC an application for a construction permit to improve the facilities of KDXU by moving to the frequency of 890 kilohertz and increasing power to 10 kilowatts, day and night.

On January 29, 1974 Albert L. Crain filed a competing application for the construction of a new AM radio station in St. George on the frequency of 890 kilohertz specifying daytime power of 50 kilowatts and nighttime power of 10 kilowatts. Crain is a resident of Colliersville, Tennessee, and licensee of station WMSO, Colliersville, and KBSN, Crane, Texas. Crain stated that he proposed to move to Colliersville and devote himself full time to the construction and operation of the new station, but it appeared that in previous applications he had also committed himself to full-time management of WMSO and to devote "as much time as practicable" to the operation of KBSN.

The Miner and Crain applications were mutually exclusive because both Miner and Crain applied for the same frequency in the same community, and they were designated for a comparative hearing, pursuant to 47 U.S.C. §§ 309(a) & (e) (1976) and the *Ashbacker* doctrine,[1] by order of the FCC dated December 13, 1974.

An evidentiary hearing was held on May 20–22, 1975, and on November 13, 1975 the Administrative Law Judge (ALJ) released his Initial Decision resolving the comparative issue of a construction permit for the frequency of 890 kilohertz in Crain's favor. The ALJ accorded Crain a strong preference on the factor of "diversification" because, given that Miner operated the only AM and FM broadcast stations in St.

George, "at the threshold, a grant of the Crain application would provide a choice of programs and service from separately owned stations for the first time; the 'planned' release of the presently Miner-occupied frequency, upon favorable grant, here notwithstanding." (J.A. at 50) In response to Miner's argument that the grant of her application would not hinder the policy of diffusing control over mass media because another applicant could operate a radio station on the vacated frequency of 1450 kilohertz, the ALJ stated:

> [A]ccepting the Miner premise of the modest economic, demographic and other proportions of the St. George community, one might question the business prudence of one having an active interest in a released frequency, where the competitor for the *modest* advertising potential in that community enjoys higher power and audience reach. But even were the Miner thesis persuasive—which it is not—the overriding consideration, particularly as here in a small community, is the potential for a *new* voice or mouthpiece of the community, diverse, perhaps even antagonistic, to what has been the custom and experience. [emphasis in original]

*Id.* at 51. In the ALJ's judgment Crain was also preferred on the issue of "efficiency" or "coverage" because his "proposal would cover 28,873 more square miles than would Miner's and serve 34,205 more people." *Id.* at 49. The ALJ noted that "[a]lthough Crain's exclusive area is at no point less than 90 miles from St. George, it includes both unserved and underserved populations." *Id.*

The ALJ acknowledged that Miner was preferred on the factor of "integration":

> The evidence under the criteria of "Full-time participation in station operation by owners" is persuasive that a preference would run to Miner, as it would appear that Crain would be required to divide his time in the operations of his station KBSN, and the contested facility here . . . . Julie P. Miner, as General

---

**1.** *See Ashbacker Radio Corp. v. FCC*, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945).

Manager/Owner, on the other hand, would be able to devote her full time to the proposed facility whether that would encompass the proposed facility and the presently owned and operated KDXU–FM, a combined operation fairly commonplace and accepted, if not encouraged by the Commission.

Subdivisional attributes of "Full-time participation in station operations by owners" are local residence, broadcast experience and participation in local civic affairs. . . . As to Julie P. Miner, a clear preference would extend by virtue of long residence in St. George, her greater familiarity with local needs and interests by that residence and reinforced by her and her family's participation in local affairs, albeit heavily oriented to church-related matters. . . . But the preference to be accorded Miner here—while clear—is but of minor significance, if only for the reason that too great emphasis on local residence and area familiarity might dampen the interests of newcomers either to broadcasting or to a given community. *Id.* at 52–53.

The ALJ found that 27 broadcast stations place primary signals over St. George and the proposed service area, that several newspapers, including two Salt Lake daily newspapers, are circulated there, and that St. George's citizens receive the signals of four television stations. (Finding 102, J.A. 34)

The ALJ concluded that any preference for Miner was outweighed by the "new voice" that Crain would bring to St. George, and thus "on diversification alone, Crain must win the day." *Id.* at 52. While finding "both applicants fully qualified to become licensees under the noncomparative or basic qualifying issues," the ALJ held that "the public interest is best served by awarding the contested franchise to . . . Crain. . . ." *Id.* at 53.

Acting on exceptions filed by the parties and after *de novo* review of the record, the Commission's Review Board upheld the determination of the ALJ and granted Crain's application for a new standard broadcast station in a decision released on July 19, 1976. 60 F.C.C.2d 892. The Review Board reasoned that any preference given Miner for integration of ownership with management, enhanced by local residence and civic participation, "is not great, because both parties do propose fulltime integration, both have broadcast experience, and both will be locally resident." *Id.* at 899. The Review Board concluded that "not only . . . will [Crain] bring a competitive service to St. George, but . . . he will provide the only competition to a two station local monopoly." *Id.* at 901. With regard to the future status of station KDXU, the Review Board stated:

We have also considered Miner's argument that . . . her application should be awarded merit since its sole principal is a woman. While we agree that minority ownership of an applicant—be it black or female—may be a consideration which is relevant to a choice among applicants where it affords a broader community representation, a grant of Miner's application does not afford such a benefit. . . . [W]e cannot presume that she will cease operation of KDXU if a grant is made to Crain. As a consequence, the extent of female ownership and participation in broadcasting will not be altered in St. George, whichever applicant receives a grant, and no merit can be awarded to Miner on the basis urged.

\* \* \* \* \* \*

Miner urges that the Initial Decision inconsistently assumed that Miner would continue the present operation of Station KDXU in the face of a grant to Crain of a facility with greater power, but that a new applicant would not be interested in using the frequency to be vacated by KDXU if the Miner application were granted. We do not see these inconsistent assumptions in the Initial Decision, but in any event we think no significant presumptions or findings are warranted on these matters. Thus, the present fact is that Miner is operating Station KDXU, and the record furnishes no basis for a presumption or a finding of a change in

that circumstance. So too, the record furnishes no basis for a presumption or a finding as to the future use of the KDXU frequency if it were vacated.... We might add that if presumptions were to be indulged in, it would seem more likely that an existing operation would be conducted in the face of competition from a higher powered station than that a newcomer would attempt to institute a new service in the face of such competition. *Id.* at 899–900, 901 n.25. Therefore the Review Board held that "the substantial difference between the applicants on diversification, together with Crain's coverage advantage, is more significant than Miner's slight preference on integration .... Crain is ... clearly to be preferred on the comparative criteria." *Id.* at 899.

By Order released on March 29, 1978 the FCC denied without opinion Miner's application for review of the Review Board's Decision, which consequently has the same force and effect as a decision by the Commission. *See* 47 U.S.C. §§ 155(d)(3) & (5) (1976). Miner thereafter petitioned for reconsideration, asserting that the FCC had not afforded her a full and fair comparative hearing and offering for the first time to accept a grant of her AM station application subject to the condition that she attempted to dispose of her FM station. The Commission dismissed the petition for reconsideration by Order released on August 18, 1978 on the grounds that no new evidence "of decisional significance" was proffered and Miner's offer to dispose of KDXU–FM came too late to improve her comparative position. This appeal by Miner, pursuant to 47 U.S.C. § 402(b)(1) (1976), followed.

In *Fidelity Television, Inc. v. FCC*, 169 U.S.App.D.C. 225, 240–41, 515 F.2d 684, 699–700, *cert. denied*, 423 U.S. 926, 96 S.Ct. 271, 46 L.Ed.2d 253 (1975), this court described its function in reviewing decisions of the Commission as follows:

[O]ur function is, as has often been repeated, a limited one. It is necessary only that we satisfy ourselves that the agency acted within the bounds of its statutory and constitutional authority, that it has followed its own procedural rules and regulations, that its findings of fact are reasonably articulated and based on substantial evidence in the record as a whole, that its conclusions do not deviate greatly from past pronouncements without sufficient explanation, and that in general it has engaged in reasoned decision-making.... [I]t is not our judicial job to direct the Commission on how to run the comparative hearing process, beyond assuring that the administrative process respects the rights of the public and of competitors assured under the Communications Act and the *Ashbacker* doctrine, and that it produces rational decisions based on factors generally known in advance. [footnotes omitted]

*See also Greater Boston Television Corp. v. FCC*, 143 U.S.App.D.C. 383, 392–93, 444 F.2d 841, 850–51 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971) in which we said "the court must be satisfied that the agency's evidentiary fact findings are supported by substantial evidence, and provide rational support for the agency's inferences of ultimate fact" and "[i]ts supervisory function calls on the court to intervene not merely in case of procedural inadequacies, or by-passing of the mandate in the legislative charter, but more broadly if the court becomes aware ... that the agency has not really taken a 'hard look' at the salient problems, and has not genuinely engaged in reasoned decision-making"; and *Johnston Broadcasting Co. v. FCC*, 85 U.S.App.D.C. 40, 46, 175 F.2d 351, 357 (1949) holding that the agency's "conclusion must be a rational result from the findings of ultimate facts, and those findings must be sufficient in number and substance to support the conclusion".

In *Valdosta Broadcasting Co.*, 11 F.C.C. 769, 773–74 (1946), the Commission held that:

The Valdosta Broadcasting Co.'s application proposes the construction and operation of a new broadcast station which would provide new and additional service to the city of Valdosta as well as serve

the rural areas proposed to be served by WGOV [which proposes a change of its facilities from a local class IV station to a regional or class III station]. Taken alone, the consideration of the establishment of an additional and competitive broadcast service would be persuasive of a grant to the Valdosta Broadcasting Co. However, we cannot accept this factor as controlling. Otherwise, an existing station seeking to improve its coverage by a change in frequency and increase in power would always be barred by a qualified applicant proposing to construct a new station on the operating assignment requested by the existing station.

*Accord, The Monocacy Broadcasting Co.*, 28 F.C.C. 301, 308, *reconsideration denied*, 29 F.C.C. 717, 718 (1960), *aff'd sub nom. The Price Broadcasters, Inc. v. FCC*, 111 U.S. App.D.C. 179, 295 F.2d 166 (1961).

In *Policy Statement on Comparative Broadcast Hearings*, 1 F.C.C.2d 393 (1965) (1965 Policy Statement), the Commission gave public notice of the most important comparative criteria governing its selection among qualified new applicants for the same broadcast facilities and identified "the best practicable service to the public" and "a maximum diffusion of control of the media of mass communications" as the "two primary objectives toward which the process of comparison should be directed." *Id.* at 394. The 1965 Policy Statement terms diversification "a factor of primary significance" and notes that "[o]ther [media] interests in the principal community proposed to be served will normally be of most significance." *Id.* In addition the 1965 Policy Statement establishes as factors of "substantial importance" both the full-time participation in station operation by its owners and an applicant's past broadcast record if that record is "unusually good or unusually poor." *Id.* at 395, 398. The 1965 Policy Statement also provides that "where one of two or more competing applicants proposes an operation which, for one or more engineering reasons, would be more efficient, this fact can and should be considered in determining which of the applicants should be preferred." *Id.* at 398.

Appellant Miner argues that she "was the superior applicant, due in large part to her long familiarity with the St. George area and demonstrated total commitment and dedication to the operations of KDXU and [KDXU–FM]" and that she was denied a full and fair comparative hearing because the Commission penalized her for being the incumbent licensee of KDXU and arbitrarily and capriciously assigned her to that inferior facility for which she did not apply. (Br. for Appellant at 16–18) Miner contends that in denying her application, the FCC, without supporting evidence, "necessarily made the finding that she would and could continue to operate on [a] frequency [of 1450 kilohertz] in the small community of St. George in the face of competition with fifty times as much power." *Id.* at 28.

In its Proposed Findings in this case, the Commission's Broadcast Bureau stated that:

Local transmission service to St. George is presently provided by Station KDXU and KDXU–FM, both licensed to Miner. However, although Crain would add a local outlet and Miner would not, this is offset by the fact that KDXU's existing frequency would become available to a qualified applicant. [Footnote omitted]

(J.A. at 125–26) Citing the *Valdosta* doctrine, the Broadcast Bureau noted that "[t]he fact that a grant to Crain would provide St. George with a second local transmission service should not be construed as meriting a comparative advantage in light of past Commission policy." *Id.* at 125 n.1. However the ALJ stated that the *Valdosta* and *Monocacy* cases "are in the vintage years of 1946 and 1960 while the controlling Commission policy is *Policy Statement on Comparative Broadcast Hearings*, 1 F.C.C.2d 393 (1965)," and he candidly ruled that "on diversification alone, Crain must win the day." (J.A. at 48, 52) The FCC's Review Board agreed with the ALJ and held that:

In the first place, *Valdosta* does not mandate a grant to the existing station in this situation, but rather holds that a

grant to the newcomer is not necessarily mandated whenever there will be added competition, and that there should be a full consideration of the comparative merits. . . . This would necessarily be so, because the bare consideration of an existing station's desire to improve its facilities would be empty of any public interest content in the absence of other considerations indicating some public benefit in that grant as opposed to a grant to a competing applicant. Furthermore, the Commission's subsequent enunciation of its views in the 1965 *Policy Statement on Comparative Broadcast Hearings* leaves no room for doubt that current Commission policy on the various comparative factors is different in emphasis. Thus, while *Valdosta* and its progeny are devoid of any substantial consideration of the public interest significance of diversifying control of broadcast interests, the 1965 *Policy Statement* and subsequent cases give this factor a strong independent significance . . .

Taking due account of the *Valdosta* approach within the bounds of the Commission's current policy, we conclude that Crain's preferences, diminished slightly as they are by the preferences awarded to Miner, remain determinative.

60 F.C.C.2d at 900–01.

■ Therefore, as is evidenced by the Broadcast Bureau's Proposed Findings, this case, as well as *Community Broadcasting Co., Inc.*, 60 F.C.C.2d 951 (1976), which was decided shortly after the Miner case, appear to represent a change in Commission policy with regard to the comparative factor of diversification. The FCC's treatment of the *Valdosta* doctrine is confusing at best, but the Commission has seemingly eviscerated that doctrine without directly overruling it. *See Community Broadcasting Co., Inc., supra* at 954 (separate concurring statement of Board Member Sylvia D. Kessler). This court has stated that "[w]hile agencies may not be bound under the doctrine of *stare decisis* to the same degree as courts, . . . it is at least incumbent upon the agency carefully to spell out the bases of its decisions when departing from prior

norms." *Food Marketing Inst. v. ICC*, 190 U.S.App.D.C. 388, 393, 587 F.2d 1285, 1290 (1978). In fact "the Rule of Law requires that agencies apply the same basic standard of conduct to all parties appearing before them" and "thus, 'if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.' " *Teamsters Local Union 769 v. NLRB*, 174 U.S.App.D.C. 310, 317, 532 F.2d 1385, 1392 (1976). These elemental tenets of administrative law were certainly strained here by the FCC's severe constriction of the *Valdosta* doctrine and resulting grant of Crain's application.

■ More fundamentally however the Commission erred in this case when it engaged in assumptions instead of making findings of fact that are "reasonably articulated and based on substantial evidence in the record as a whole." *Fidelity Television, Inc. v. FCC, supra*, 169 U.S.App.D.C. at 240, 515 F.2d at 699. Both the ALJ and the Review Board assumed that if Crain's application were granted Miner would continue to operate station KDXU on a frequency of 1450 kilohertz but that if Miner's application were granted it would be less likely that a newcomer such as Crain would institute a new service on the frequency vacated by Miner in the face of competition from a higher power radio station. *See* J.A. at 51; 60 F.C.C.2d at 899–900, 901 n.25. Such conclusions are without support in the record. No inquiry was made nor was there satisfactory evidence as to how and to what degree the grant of either application would aid or hinder competition.

If, as the 1965 Policy Statement directs, "diversification of control of the media of mass communications" is "a factor of primary importance" in comparative broadcast hearings (1 F.C.C.2d at 394), it must be achieved in a way that is fair and does not automatically disadvantage existing licensees who have a record of service in favor of untried newcomers. The FCC must impartially seek information—and not require the existing licensee to overcome an insur-

**158**

mountable burden of proof—as to what will happen to both the old and new stations depending on who is licensed to operate the more desirable one. Here there is no record on such questions, but only supposition. It is patently unfair to resolve a comparative hearing on the issue of desired competition when there is no investigation directed toward the factual realities of whether increased competition will actually result.

The key to the ALJ's Initial Decision and the Review Board's Decision is their assertion that Crain will bring a "new voice" to St. George and "will provide the only competition to a two station local monopoly." J.A. at 51; 60 F.C.C.2d at 901. Yet, as the ALJ admitted, Miner's station KDXU–FM is "a combined operation fairly commonplace and accepted, if not encouraged by the Commission" (J.A. at 52); and instead of examining the facts, weighing and analyzing the various possibilities, and making the requisite findings, the ALJ and the Review Board simply took for granted that Miner would remain as a competitor if Crain's application were approved. Although "a maximum diffusion of control of the media of mass communications" may be a commendable goal (1 F.C.C.2d at 394), what the Commission has done in this case creates the worst of both worlds—controlled competition without equal access to the marketplace. Here the FCC has not engaged in "reasoned decision-making" because it has not taken a "hard look" at the "salient problem" of equitably fostering competition in the context of mutually exclusive applications such as those filed by Miner and Crain and because its findings are not "sufficient in number and substance to support the conclusion" reached. *Greater Boston Television Corp. v. FCC, supra,* 143 U.S.App.D.C. at 393, 444 F.2d at 851; *Johnston Broadcasting Co. v. FCC, supra,* 85 U.S.App.D.C. at 46, 175 F.2d at 357.

For the foregoing reasons the Commission's decisions in *Julie P. Miner,* 60 F.C.C.2d 892 (Rev. Bd. 1976), *review denied,* 67 F.C.C.2d 1612 (March 2, 1978), *reconsideration denied,* FCC 78–610 (August 18, 1978) (J.A. 72) is reversed and the case is remanded for proceedings not inconsistent with this opinion.

*So ordered.*