**COMMITTEE FOR COMMUNITY ACCESS, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

Grandbanke Corporation, Intervenor.

**SAVE OUR STATION COMMITTEE, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

Grandbanke Corporation, Intervenor.

**Simon GELLER, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

Grandbanke Corporation, Intervenor.

Nos. 82–2314, 82–2373 and 82–2400.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 27, 1983.

Decided June 15, 1984.

Barbara S. Brodlieb, New York City, and Gary Trachten, Atlanta, Ga., were on brief, for appellant, Committee for Community Access, in No. 82-2314.

Mark L. Gerchick, Washington, D.C., with whom Paul A. Zevnik and Milinda M. Patrick, Washington, D.C., were on brief, for appellant, Save Our Station Committee, in No. 82-2373.

James A. Moody, Washington, D.C., with whom Anthony S. Murry, Washington, D.C., was on brief, for appellant, Simon Geller, in No. 82-2400.

Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C., with whom Bruce E. Fein, Gen. Counsel, Sheldon M. Guttmann, Associate Gen. Counsel, and Sue Ann Preskill, Counsel, F.C.C., Washington, D.C., were on brief, for appellee in Nos. 82-2314, 82-2373 and 82-2400. L. Andrew Tollin and Marjorie S. Reed, Counsel, F.C.C., Washington, D.C., also entered appearances for appellee.

John P. Bankson, Jr., Washington, D.C., with whom Jo-Ann McNally Muir, Washington, D.C., was on brief, for intervenor, Grandbanke Corp., in Nos. 82-2314, 82-2373 and 82-2400.

Thomas Schattenfield, David Tillotson and Mania K. Baghdadi, Washington, D.C., were on brief, for amicus curiae, National Radio Broadcasters Ass'n, urging that the Commission's decision be set aside.

Before WALD, MIKVA and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

This case represents yet another meandering effort by the Federal Communications Commission (FCC or Commission) to develop a paradigm for its license renewal hearings. For years, this court has urged the FCC to put some bite into its comparative hearings. *See, e.g., Central Florida Enterprises, Inc. v. FCC (Central Florida I)*, 598 F.2d 37 (D.C.Cir.1978), *cert. dismissed*, 441 U.S. 957, 99 S.Ct. 2189, 60 L.Ed.2d 1062 (1979). Indeed, we have too long hungered for just one instance in which the FCC properly denied an incumbent's renewal expectancy. Unfortunately, in the process of seeking to respond to this court's signals with regard to the renewal expectancy, the FCC ignored its own precedents as to the other factors that must be considered in conducting a comparative analysis. Moreover, the Commission's ap-

proach here raises serious First Amendment concerns. Therefore, while we affirm the Commission's denial of the incumbent's renewal expectancy, we remand the case so that the FCC can recalculate the comparative factors. We affirm, however, the Commission's denial of the petitions for reconsideration filed by two community groups that were not parties to the initial licensing proceeding.

## I. BACKGROUND

The ultimate question in this case is who should be the licensee of WVCA, the only broadcast station in Gloucester, Massachusetts, a community of approximately 28,000 denizens located about twenty-five miles from Boston. Although Gloucester is within the broadcast range of many non-Gloucester stations, the only locally-based media are WVCA and a single daily newspaper.

WVCA's current licensee is Simon Geller, who has held the license for twenty years and who, operating at a minimal profit, has been the station's sole owner, operator, announcer, technician, and salesman. After experimenting with a variety of programming formats, Geller began in 1968 to broadcast only symphonic music. In his 1972 renewal application Geller proposed to broadcast 99.77% symphonic music. His format from 1972–75 thus included very few commercials and more significantly, very little "nonentertainment", informational programming. Geller, however, satisfied all the obligations imposed in his 1972–75 license and, in fact, offered more nonentertainment programming than his proposal contained. Nonetheless, the total amount of nonentertainment programming remained less than 1%.

Geller's 1975 renewal application, the application here in controversy, was challenged by Grandbanke Corporation. While Geller again proposed an exclusively symphonic music format with only a small amount of nonentertainment programming, Grandbanke proposed a musical medley, with approximately 28.7% of its broadcast week devoted to nonentertainment programming.

As the licenses were mutually exclusive, a comparative hearing was ordered. At the hearing, many residents of Gloucester expressed their support for Geller and testified as to the benefit they received from Geller's symphonic format. At the hearing's conclusion, the administrative law judge (ALJ) found that Geller was qualified to remain a licensee and was entitled to a renewal expectancy because of his favorable past record. The ALJ also concluded that Geller was entitled to a preference for "integration of ownership and management" and for "diversification of media ownership." Accordingly, Geller was found to be the superior applicant and thus received the license renewal.

In June 1982, the Commission, after agreeing with the ALJ's conclusion that both applicants were "basically qualified," denied Geller's renewal application and granted the license to Grandbanke. To reach this result, the Commission denied Geller a renewal expectancy and awarded him only diminished preferences under the criteria of diversification and integration. Grandbanke received a substantial preference for its program proposal and a slight preference for its more efficient use of the radio spectrum. Throughout the entire proceeding, Geller, a non-lawyer, represented himself.

Subsequent to the FCC's decision, Geller, now represented by counsel, petitioned for reconsideration. In this petition, Geller explained that the station's transmitter site had been moved and that the station's service hours had been, and would continue to be, increased. These changes could diminish substantially Grandbanke's preference for efficient use of the radio spectrum. Geller also sought to demonstrate that newly offered financial assistance would enable an increase of nonentertainment programming.

At the same time, two organizations heretofore uninvolved with the proceedings filed petitions for reconsideration: Committee for Community Access (CCA), an organ-

ization of listeners and media professionals in the greater Boston area; and Save Our Station (SOS), an organization formed by the listeners of Geller's station in response to the FCC's denial of his renewal application.

The FCC denied all petitions for reconsideration. With regard to Geller's petition, the Commission concluded that the petition was a prohibited post-designation amendment that enhanced his comparative position. With regard to CCA and SOS, the Commission concluded that neither group had standing to file a petition for reconsideration.

## II. ANALYSIS

■ The proper standard of review in evaluating an FCC decision reached after a comparative hearing has been articulated innumerable times by this court. *See, e.g., Victor Broadcasting, Inc. v. FCC,* 722 F.2d 756 (D.C.Cir.1983); *Central Florida Enterprises, Inc. v. FCC (Central Florida II),* 683 F.2d 503 (D.C.Cir.1982), *cert. denied,* 460 .U.S. 1084, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983); *Miner v. FCC,* 663 F.2d 152 (D.C.Cir.1980). As we stated in *Central Florida I,* 598 F.2d at 49, "[T]he agency must engage in reasoned decision-making, articulating with some clarity the reasons for its decisions and the significance of facts particularly relied on." Moreover, the agency cannot silently depart from previous policies or ignore precedent. "[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *See Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir. 1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971).

### A. *The Renewal Expectancy*

The Commission denied Geller a renewal expectancy, that extra "plus" an incumbent can receive in the comparative hearing *if* the public has enjoyed superior service during the previous license period. *See Victor Broadcasting, supra; Central Florida II,*

*supra, Central Florida I, supra.* The weight of the renewal expectancy reflects the broadcaster's past record: the better the record, the greater the weight. Conversely, the worse the record, the less weighty the renewal expectancy.

For many years, the FCC imposed an affirmative obligation on licensees to undertake formal ascertainment studies to determine issues of importance to the community. This required the broadcaster to interview community leaders and other listeners to determine the issues of interest to the community. By the time the Commission reviewed Geller's renewal application, the requirement of *formal* ascertainment studies had been eliminated. *Report and Order, Deregulation of Radio,* 84 F.C.C.2d 968 (1981), *aff'd sub nom. Office of Communication of the United Church of Christ v. FCC,* 707 F.2d 1413 (D.C.Cir. 1983). The licensee, however, still must determine the major issues in the community. In the instant case, the Commission measured Geller's prior performance by the pre-deregulation standards, existing during the 1972–75 license period. Future programming, however, was measured under the new deregulation policies. 90 F.C.C.2d at 252 n. 8. Under either means, the broadcaster must air programs directed at ascertained needs. *See Primer on Ascertainment of Community Problems,* 27 F.C.C.2d 650 (1971). As we previously have observed: "The basic principle underlying [this] ascertainment policy is clear: For a radio licensee to provide programming responsive to issues facing the community, it must first ascertain just what those issues are." *Office of Communication of the United Church of Christ v. FCC,* 707 F.2d 1413, 1435 (D.C.Cir.1983).

■ Geller failed to comply with these substantive requirements. The Commission found that "Geller broadcast no news, no editorials, and none of his [nonentertainment] programming was locally produced. None of his programs, moreover, were presented in response to ascertained community needs and problems." 90 F.C.C.2d 265. Because Geller had not adequately

ascertained community needs, he could not, by definition, air responsive programs. Thus, it was reasonable for the Commission to conclude that Geller's previous service did not warrant a renewal expectancy.

### B. *The Comparative Issues*

Having concluded that Geller was not entitled to a renewal expectancy, the Commission compared Geller and Grandbanke on the standard comparative issues. *See Policy Statement on Comparative Broadcast Hearings,* 1 F.C.C.2d 393 (1965) (*1965 Policy Statement*). The issues include diversification of ownership, integration of ownership and management, proposed programming, and efficient use of the radio spectrum. *See West Michigan Broadcasting Co. v. FCC,* 735 F.2d 601, at 604–605 (D.C.Cir.1984).

On diversification of ownership of mass communications media, Geller's "strong preference"—stemming from the fact that while Geller controlled no other stations, Grandbanke operated several others—was reduced to a "moderate preference" because Geller would not bring a new information "voice" to the community. 90 F.C.C.2d at 272. On "integration of ownership and management," Geller, who represented the ultimate level of integration because he was sole owner and operator, received only a "slight" preference because of the station's prior broadcasting record. *Id.* at 273. On "proposed programming," Grandbanke received a "substantial preference." *Id.* at 274. Grandbanke also received "credit" for its longer hours and a "slight preference" for its larger area of coverage. *Id.* at 275–76. The Commission therefore concluded that Grandbanke's application was more in the public interest, and accordingly granted Grandbanke the Gloucester license.

In applying these criteria, however, the Commission departed from its own precedents and telescoped a normally multifaceted approach into a single issue analysis of past performance. Although superficially working through each comparative factor, the Commission essentially invoked past performance as a talisman in each segment of its analysis. The Commission therein side-stepped any real consideration of the factors it has identified as the guideposts for assessing competing license applications. This departure from past precedent is most clearly evident in the Commission's analysis of each separate factor. Indeed, the Commission's insistence on using past performance as the universal answer led it to adopt an analysis of diversification that raises serious First Amendment concerns.

While we intimate no opinion as to the final outcome of the comparison, the case must be remanded so that the Commission can reexamine the various factors that comprise the comparative evaluation.

### 1. *Diversification*

Under the "diversification of ownership" criterion, the Commission traditionally considers whether an applicant's owners have ownership interests in other broadcast stations and other mass communication media. *See 1965 Policy Statement,* 1 F.C.C.2d at 394. The FCC consistently identifies this factor as one of "primary significance since ... it constitutes a primary objective in the licensing scheme." *Id.*

The diversification criterion serves two distinct purposes. First, its application helps avoid concentration of media ownership and therefore serves as a check against any monopolistic tendencies in the broadcast industry. *See, e.g., Massachusetts Bay Telecasters, Inc. v. FCC,* 261 F.2d 55 (D.C.Cir.1958). Second, diversification of ownership furthers First Amendment concerns by increasing the likelihood that the community will hear more viewpoints. *See Associated Press v. United States,* 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945). The Supreme Court recognized these dual objectives in *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 780, 98 S.Ct. 2096, 2104, 56 L.Ed.2d 697 (1978):

> In setting its licensing policies, the Commission has long acted on the theory that diversification of mass media ownership serves the public interest by promoting

diversity of program and service viewpoints, as well as by preventing undue concentration of economic power. *See also TV 9, Inc. v. FCC*, 495 F.2d 929, 937 (D.C.Cir.1973), *cert. denied*, 419 U.S. 986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974); *Citizens Communication Center v. FCC*, 447 F.2d 1201, 1213 n. 36 (D.C.Cir.1971). The two purposes, however, are inextricably intertwined since they both aim at diluting the concentration of media ownership.

In weighing the diversification factor, the Commission traditionally has dealt in probabilities rather than certainties. That is, the operating presumption has long been that as diversity of ownership increases, diversity of viewpoints expands. This criterion thus allows the FCC to assess the *likelihood* that a broadcaster will present diverse views, without having to assay the actual diversity of the views themselves. As the Commission recently explained in summarizing its diversification policy:

> In diversification cases we seek to promote the maximum diffusion of control of the media. . . . [W]e evaluate media interests in terms of the *potential* impact on media concentration and diversity of viewpoint *without resolving whether such concentration will actually occur.*

*Absolutely Great Radio, Inc.*, 55 RAD.REG. 2d (P & F) 15, 19 (1983) (emphasis added). *See also Statement of Policy on Minority Ownership of Broadcasting Facilities*, 68 F.C.C.2d 979, 983 (1978); *Terre Haute Broadcasting Corp.*, 25 F.C.C.2d 348 (Rev. Bd.1970), *rev'd other grounds*, 32 F.C.C.2d 882 (Rev.Bd.1971). As the test is structured, there is no room for the FCC to evaluate the actual diversity of the views.

Indeed, a move away from this underlying presumption and toward an evaluation of the diversity of views presented would raise First Amendment concerns. In *Central Florida I*, for example, we held that the Commission erred when it looked behind the presumption that underlies the diversification factor—that diversification of ownership leads to diversity of viewpoints—and instead evaluated the degree to which each applicant would present diverse views. In rejecting the Commission's analysis we emphasized that *ownership* was the touchstone to award the diversification preference. *See* 598 F.2d at 53 ("We should have thought the relevance of unconcentrated media *ownership* to the public interest inquiry was well-settled.") (emphasis in original). Our reasoning was twofold:

> First, the prospect of inquiry into the content of programming as would be entailed in defining "uniform expression" raises serious First Amendment questions. . . . Second, to require a showing of the "dangers of concentration" in each case would remove the customary presumption on which the structural approach to increasing ownership diversification has rested.

*Id.* at 54. The court thus found that the Commission had acted unreasonably when it diminished the challenger's relative diversification preference, a preference directly linked to ownership. *See also TV 9, Inc. v. FCC*, 495 F.2d 929, 938 (D.C.Cir.1973), *cert. denied*, 419 U.S. 986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974) (noting that in applying comparative factors, "[r]easonable expectation, not advance demonstration, is a basis for merit to be accorded relevant factors"); *id.* at 938 ("[I]t is upon *ownership* that public policy places primary reliance with respect to diversification of content, and that historically has proven to be significantly influential with respect to editorial comment and the presentation of news.") (emphasis added); *see generally Garrett v. FCC*, 513 F.2d 1056 (D.C.Cir.1975).

■ Evaluating the instant case against this background, it is clear that the FCC improperly changed its application of the diversification criterion when it reduced Geller's preference for diversification. After acknowledging the deconcentration of ownership objective of this criterion, 90 F.C.C.2d at 272 n. 107, the FCC nonetheless diminished what would seem to be a strong diversification preference for Geller, reasoning:

[A]lthough Geller has *no other media interest,* it cannot be said that he qualifies as a "diverse and antagonistic source" of information in the community. With no news, no editorializing and virtually no public affairs programming, Gloucester does not hear a separate information voice—indeed, *it hears no information at all.* Therefore, while Geller's diversification showing is technically superior to Grandbanke's, he should receive no strong preference in this regard. A moderate preference will be given instead.

90 F.C.C.2d at 272 (footnotes omitted) (emphasis added).

The FCC's position here reflects a substantial departure from its previous practices. Inherent in its conclusion is a wholesale abandonment of the presumption that diversity of *ownership* is the litmus test for diversity of viewpoints. Ignoring this well-established presumption, the Commission assessed the diversity of *views* that each broadcaster would air. Focusing on the programming Geller proposed, the FCC concluded that Geller would not offer a new voice to the community because he offers "no voice at all." Therein must lie the conclusion that Geller's programming is of no value to the community, despite extensive testimony to the contrary. This type of content evaluation is exactly what we prohibited in *Central Florida I* and *TV 9.* As we found it unreasonable in those cases, so we must find it unreasonable here.

At a minimum, the Commission's departure from its prior policies was unaccompanied by any explanation. It cannot be gainsaid that an agency cannot silently change its policies. The Commission thus cannot *sub silentio* alter its analysis of the diversification factor. *See, e.g., Miner v. FCC,* 663 F.2d 152, 155 (D.C.Cir.1980); *Central Florida I,* 598 F.2d at 49. At a minimum, the Commission should have acknowledged this change in orientation and should have explained the nexus between the policy and the goals diversification seeks to promote.

Of course, this approach would then have squarely raised First Amendment issues.

The Commission suggests that its inquiry here is distinguishable from that which we prohibited in *Central Florida I* since in this case the FCC did not engage in a "subjective analysis into program content." 90 F.C.C.2d at 272 n. 110. This purported distinction is specious since in concluding that Geller's programming offered "no separate voice" the FCC clearly evaluated that which Geller proposed to broadcast. Although it was only a small percentage of his programming, Geller did propose some informational programming for the community.

Hidden in its analysis, the Commission may have been suggesting a new presumption: that diversity of viewpoints is furthered by that applicant which offers *more* informational programming. We reject this reasoning on two grounds. First, this new presumption was adopted silently, without any attempted explanation. This the FCC cannot do. *See Greater Boston Television Corp., supra.* Second, and more important, this presumption is counterintuitive in cases where, as here, that applicant which offers more informational programming controls other stations and thus, under existing presumptions, is presumed not to offer *any* new "ideas". Simply, a small "new voice" may do more to further the First Amendment than a loud or large "old voice".

We hold that the Commission erred in the manner in which it measured the diversification of ownership criterion. Its approach here flew in the face of its own precedents and previous decisions by this court. As we observed in *Central Florida I:*

> Apart from the obvious unfairness of placing this novel burden on [the applicant] without fair notice, the question arises whether this has not seriously undercut the utility of the diversification criterion. The brief answer must be that it has.

598 F.2d at 53. The same commentary rings true in the instant case. Because

diversification is a factor of "primary significance", the case must be remanded so that the Commission can recalculate its comparative analysis.

## 2. *Integration*

■ We also are troubled by the Commission's treatment of the "integration of ownership and management" criterion. The Commission should use the opportunity on remand to better articulate its management of this issue.

As with diversification, integration is a factor of great importance—a factor used to gauge whether programming is likely to be in the public interest.

> It is inherently desirable that legal responsibility and day-to-day performance be closely associated. In addition, there is a *likelihood* of greater sensitivity to an area's changing needs, and of programming designed to serve these needs, to the extent that the station's proprietors actively participate in the day-to-day operation of the station.

*1965 Policy Statement, supra,* 1 F.C.C.2d at 395 (emphasis added); *see also id.* at 396 ("Participation in station affairs ... by a local resident indicates a likelihood of continuing knowledge of changing local interests and needs."). As the Commission recently stated:

> While diversification satisfies the independent goal of diffusing viewpoints in the mass media, integration simply serves to predict future service in the community. The integrated owner is presumed to have a stronger tie between legal responsibility and day-to-day management and to be more sensitive to community needs than the absentee owner.

*Cowles Broadcasting,* 86 F.C.C.2d 1013, 1016 (footnote omitted), *aff'd sub nom. Central Florida II, supra.*

The Commission's customary analysis of integration involves a two-part inquiry. First, the Commission examines the *quantitative* attributes of the applicants. *See, e.g., The New Continental Broadcasting Co.,* 55 Rad.Reg.2d (P & F) 413 (Rev.Bd. 1983); *WIOO, Inc.,* 54 Rad.Reg.2d (P & F)

1291 (1983); *Merrimack Valley Broadcasting, Inc.,* 92 F.C.C.2d 506 (Rev.Bd.1982); *Scott & Davis Enterprises, Inc.,* 88 F.C. C.2d 1090 (Rev.Bd.1980); *Gainesville Media, Inc.,* 72 F.C.C.2d 795 (1979). *See also West Michigan Broadcasting Co. v. FCC,* 735 F.2d 601, at 604–606 (D.C.Cir.1984). The Commission here focuses on the degree to which the owners will be involved in the day-to-day operation, examining the percentages of ownership and amount of time each owner will spend at the station. After completing this quantitative analysis, the Commission turns to a *qualitative* analysis, focusing on certain factors—such as past broadcast record, local residence, and minority status—that reflect the attributes of those owners who will have the operating responsibility. In looking at these features, the Commission and the Review Board repeatedly have emphasized that "qualitative attributes of participating owners may enhance the value of an integration proposal *but cannot overcome clear quantitative differences." Absolutely Great Radio, Inc.,* 55 Rad.Reg.2d (P & F) 15, 21 (1983) (emphasis added). *See also Scott & Davis Enterprises, Inc.,* 88 F.C. C.2d 1090 (Rev.Bd.1980); *Van Buren Community Service Broadcaster, Inc.,* 87 F.C. C.2d 1018 (Rev.Bd.1980). In 1982, the Review Board noted that "in the seventeen years of comparative proceedings under the [1965] Policy Statement, no case of which we are aware has been decided where the applicant with the clear quantitative integration advantage did not receive the preference under this criterion." *Merrimack Valley Broadcasting, Inc.,* 92 F.C. C.2d 506 (Rev.Bd.1982).

Although the Commission usually utilizes the "qualitative factors" to *enhance* an applicant's position in the integration comparison, such factors occasionally are used to downgrade a party's position. *See, e.g., Gainesville Media,* 72 F.C.C.2d 795 (1979); *East St. Louis Broadcasting Co.,* 29 F.C. C.2d 170 (1971). In these situations, however, severe downgrading is reserved for those applicants guilty of *misconduct.* For example, in *Gainesville Media, supra,* the Commission decreased a high merit for

integration where the owner previously had violated Commission rules by misrepresenting the station's coverage area. *See also Town & Country Radio, Inc.*, 65 F.C.C.2d 694 (Rev.Bd.1977); *see generally WIOO, Inc.*, 54 RAD.REG.2d (P & F) 1291 (1983) (implying that substantial demerits are reserved for owners guilty of significant misconduct).

In the instant case, the ALJ concluded "[t]hough Grandbanke proposes a substantial amount of ownership participation, Geller must be preferred under this criterion. The totality of his commitment, strengthened by his extensive background in broadcasting and his years of residence in the community, is simply not matched by Grandbanke." The Commission disagreed and summarily held that despite "Geller's 100% integration of ownership with management," Geller's preference would only be slight his "technical superiority under the integration standard must be weighed against his poor record of response to community needs."

The Commission suggests that its cursory analysis of Geller's integration preference reflects the interplay between the quantitative and qualitative factors outlined above. Assuming *arguendo* that this analytical approach is what the Commission intended, we think it necessary for the Commission to rework its analysis when the case is on remand. The Commission's approach here is difficult to reconcile with its approach in previous, similar situations. For example, nowhere is there any explicit weighing of the *quantitative* merits, nowhere is there any analysis of how Geller's local ownership, a qualitative factor, fits into the analysis, and nowhere is there any explanation of how this case fits in with the prior cases that have used the qualitative factors to downgrade an applicant's position only when *misconduct* has been present. We have previously rejected such unexplained departures from agency precedent. *See, e.g., Miner v. F.C.C.*, 633 F.2d at 152. *See also Office of Communication of the United Church of Christ*, 707 F.2d at 1425.

Moreover, and more important, this lack of similarity with precedent lends credence to Geller's argument that the Commission yet again adopted, *sub silentio*, a "functional" analysis such as we condemned in *Central Florida I*. In that case, we soundly criticized the Commission for ignoring the ownership-management relationship and instead using other indicia to gauge management sensitivity to community concerns.

> In a way wholly analogous to the diversification question, the Commission replaced the customary integration criterion … with a functional inquiry into whether management autonomy had been an adequate surrogate for owner-management.

*Central Florida I*, 598 F.2d at 56. Geller argues that the Commission committed the same error here. Geller's argument is buttressed by the scant attention that the Commission paid to the actual integration of ownership and management before it pushed this critical factor aside. In its place, the FCC substituted the highly questionable assumption that because Geller provided "insufficient programming" during his past license period, he was unlikely to be "more sensitive to the community needs than [Grandbanke]." To the extent that the Commission's approach reflects a functional analysis, the same result as we reached in *Central Florida I* is warranted and the FCC's decision must be set aside as unreasonable.

In sum, the Commission's analysis is simply too cursory and vague to be upheld. If the Commission intended to utilize the quantitative/qualitative factors, the analysis said too little. Likewise, too little was said if the Commission intended to utilize a functional approach. On remand, the Commission must shed some light on its current shadowy analysis.

### 3. *Proposed Programming*

██ The Commission concluded that Grandbanke demonstrated a "superior devotion to public service, and that its proposed programming is entitled to a sub-

stantial preference." 90 F.C.C.2d at 274. In reaching this conclusion, the Commission primarily compared the quantity of non-entertainment programming responsive to community needs. In assessing the applications, the Commission applied the "new" deregulated standards for ascertainment of community needs. *Report and Order, Deregulation of Radio,* 84 F.C.C.2d 968 (1981), *aff'd sub nom. Office of Communication of the United Church of Christ v. FCC,* 707 F.2d 1413 (D.C.Cir. 1983).

We cannot conclude that the FCC's approach was unreasonable or that the conclusion it reached was arbitrary. The Commission concluded that Grandbanke's programming was more in the public interest than was Geller's since Grandbanke had ascertained community needs and had proposed substantial programming to meet those needs. This type of factual conclusion based on a comparative analysis is one best suited for the Commission's expertise and one that we are most hesitant to upset. Because we do not find the Commission's approach unreasonable or unsupported in the record as it then existed, we leave this finding undisturbed.

### C.  *Geller's Petition for Reconsideration*

■ Subsequent to the Commission's designation of a comparative hearing, a number of facts developed that Geller sought to introduce in a petition for reconsideration. First, Geller wanted to demonstrate that the length of his broadcast day had increased from approximately 44 hours per week during the license period, to approximately 72 hours per week prior to the hearing's commencement, to approximately 93 hours per week at present. At the 1978 hearing, Geller apparently had testified as to the original increase to 72 hours per week. Second, Geller wanted to show that he could now reach a larger geographic area since, pursuant to FCC approval, he had relocated and improved WVCA's antenna. Third, Geller wanted to show that because of new financial assistance, he could increase his nonentertainment pro-

gramming. The Commission denied Geller's petition, reasoning that the petition represented a post-designation amendment that would improperly enhance his comparative position. Relying on *Erwin O'Conner Broadcasting Co.,* 22 F.C.C.2d 140 (Rev.Bd.1970), the Commission held that Geller's petition was inadmissible. 52 RAD. REG.2d (P & F) 709, 711.

In *Erwin O'Conner,* the Review Board refused to allow an amendment because the movant failed to show good cause. 22 F.C.C.2d at 143. That case used six factors to evaluate good cause:

> [T]he moving party must demonstrate that it acted with due diligence; that the proposed amendment was not required by the voluntary act of the applicant; that no modification or addition of issues or parties would be necessitated; that the proposed amendment would not disrupt the orderly conduct of the hearing or necessitate additional hearing; that the other parties will not be unfairly prejudiced; and that the applicant will not gain a competitive advantage.

*Id.*

Although the Commission's analysis of the *Erwin O'Conner* factors here is somewhat sparse, we affirm its decision to deny Geller's petition for reconsideration. In finding that Geller's petition would enhance his comparative position, the Commission found, in essence, that the petition for reconsideration would allow Geller to gain a competitive advantage. Therein, the Commission implicitly found that Geller had failed to establish good cause. Moreover, the Commission's decision merely reflects its rule that post-designation petitions that enhance an applicant's comparative position are inadmissible. *See, e.g., Western Connecticut Broadcasting Co.,* 69 F.C.C.2d 1890, 1894 (1978).

We note, however, that in some cases the Commission has opened the record following a remand from this court. *See, e.g., Kenneth J. Crosthwait,* 47 RAD.REG.2d 1249 (1980); *Charles W. Jobbins,* 68 F.C. C.2d 46 (1978). In *Charles W. Jobbins,* the Commission, at least in part, was concerned

that the data in the applications had become outmoded with the passage of time. The Commission thus directed the applicants to "review their applications thoroughly and to submit whatever materials are necessary to reflect their current status in terms of fulfilling the Commission's legal, financial, technical, character and other qualifications under the rules and policies applicable to these applications." 68 F.C.C.2d at 51. We leave for the Commission the question of whether this case presents circumstances that warrant the reopening of the record subsequent to our remand.

### D. *SOS and CCA Petitions*

■ The Commission denied the petitions for reconsideration of these two organizations on the grounds that they lacked standing, and that they had not demonstrated good cause for their failure to participate earlier. We believe that this conclusion is sound, consistent with past FCC precedents, and supported by the record. *Cf. Springfield Television Broadcasting Corp. v. FCC,* 328 F.2d 186 (D.C.Cir.1964). We thus affirm the FCC's decision denying these petitions. Similarly, we affirm the FCC's decision denying CCA's motion to intervene.

This case is distinguishable from *Joseph v. FCC,* 404 F.2d 207 (D.C.Cir.1968), a case upon which SOS heavily relies. This court there concluded that substantial compliance with F.C.C. regulations had been present, and that the party's failure to comply fully was due, at least in part, to a series of confusing actions undertaken by the Commission. Here, neither SOS nor CCA "substantially complied," and, in terms of these organizations' petitions, no "fault" can be assigned to the Commission. Thus, we find *Joseph* inapposite.

Both CCA and SOS argue that they had "good cause" to refrain from earlier involvement because neither suspected that Geller would not receive his license. We find this argument unpersuasive on two fronts. First, we believe that reasonable parties would have perceived the possibility of Geller's loss. Indeed, we frequently have emphasized that the incumbent licensee has no "lock" in a comparative renewal hearing. *See, e.g., Victor Broadcasting, Central Florida I & II.* Second, and more important, CCA's and SOS's theories of good cause are founded on an argument of surprise. If we were to require the Commission to accept surprise as a sufficient justification for a new party to seek reconsideration, the Commission's—and indeed the public's—interest in finality of licensing decisions would be eviscerated. We thus decline to rule, as CCA and SOS would have us, that surprise alone is invariably tantamount to good cause.

### III. CONCLUSION

We have considered other arguments raised but not explicitly addressed and find them unpersuasive. For the reasons set forth above, this case is remanded to the Commission for proceedings consistent with this opinion.

*It is so ordered.*